OPINION OF THE COURT
Jasen, J.
In a tragic incident occurring on Thanksgiving Day, November 25, 1976, appellant Robert Torsney, a New York City police officer, shot and killed a 15-year-old Black youth. He was indicted and charged with second degree murder. At his trial, held in November, 1977, one year after the incident, Torsney interposed as a defense a lack of criminal responsibility for his conduct on the date of the crime charged stemming from a mental disease or defect diagnosed as psychomotor epilepsy. On November 30, 1977, the jury returned a verdict of not guilty by reason of mental disease or defect. (Penal Law, § 30.05.) '
. On that same date, Torsney was ordered committed to the custody of the Commissioner of the Department of Mental Hygiene, petitioner-appellant, pursuant to CPL 330.20 (subd 1) . After initial commitment to Mid-Hudson Psychiatric Center, Torsney was transferred to Creedmoor Psychiatric Center on March 3, 1978. Shortly thereafter, a recommendation was made to the Director of Creedmoor that inasmuch as Torsney was not dangerous or mentally ill, he should be released. On May 19, 1978, a special release committee was convened for the purpose of examining Torsney to determine his suitability for release. After the special release committee agreed with the staffs findings and recommendations, in which the then Director of Creedmoor, Dr. Werner, concurred, the findings and recommendations were reported to the commissioner. The commissioner thereupon convened an independent review panel, which also concurred in the recommendation.
Thereafter, on July 20, 1978, pursuant to CPL 330.20 (subd 2) , the commissioner petitioned the committing court for an order discharging Torsney from his custody. The court ordered a full evidentiary hearing and at the conclusion of which sustained the petition and ordered Torsney released pursuant *671 to CPL 330.20 (subd 3)[1] upon the following conditions: (1) that he not be permitted to carry a gun; (2) that he not be a police officer or peace officer; (3) that he continue as an outpatient at Creedmoor for a period of five years on conditions to be imposed as determined by Creedmoor Psychiatric Center; and (4) if within five years after the conditional release the court should determine after a hearing that for the safety of Mr. Torsney or of others the conditional release should be revoked, the court must recommit him.[2] On cross appeals taken by the District Attorney and by the commissioner and Torsney, the Appellate Division reversed and ordered that Torsney be recommitted to the custody of the Commissioner of Mental Hygiene.
On this appeal, two issues are presented for our review. The threshold issue is whether the Appellate Division properly construed the standard for release of persons held in the custody of the Commissioner of the Department of Mental Hygiene pursuant to CPL 330.20. Contingent upon resolution of this issue is the second issue: namely, whether evaluated under the proper standard for release the weight of the credible evidence presented at the hearing requires the detainee’s continued confinement, discharge or release on condition.
We begin our analysis of the threshold issue with CPL 330.20 (subd 1), which provides in pertinent part: "Upon rendition of a verdict of accquittal by reason of mental disease or defect, the court must order the defendant to be committed to the custody of the commissioner of mental, hygiene to be placed in an appropriate institution in the state department of *672 mental hygiene.” In recently sustaining the constitutionality of the automatic commitment of persons acquitted by reason of mental disease or defect, this court observed that "[a]n individual who has committed an act of violence, and has thus demonstrated his dangerousness, and who has successfully asserted an insanity defense, may quite properly be treated somewhat differently from other individuals who, although they may in fact be potentially equally dangerous as a result of mental problems, have not yet so vehemently demonstrated their dangerousness by violent antisocial behavior.” (People ex rel. Henig v Commissioner of Mental Hygiene, 43 NY2d 334, 338; see, also, People v Lally, 19 NY2d 27; People ex rel. Peabody v Chanler, 133 App Div 159, affd 196 NY 525 [sustaining constitutionality of predecessor statutes to CPL 330.20].) For this reason, persons acquitted under CPL 330.20 may be viewed as an "exceptional class” justifying commitment to the custody of the Commissioner of Mental Hygiene without a prior hearing to determine their mental condition on the date of acquittal.
The purpose of automatic commitment after acquittal of a crime by reason of mental disease or defect is a narrow one: to determine the mental condition of the person committed on the date of acquittal. Notwithstanding the literal terms of CPL 330.20, automatic commitment of persons acquitted of crimes by reason of mental disease or defect is constitutionally permissible only for a reasonable period of time — that is, sufficient time to permit an examination and report as to the detainee’s sanity. (People ex rel. Henig v Commissioner of Mental Hygiene, 43 NY2d, at p 339, supra; People v Lally, 19 NY2d, at p 33, supra; People v McNelly, 83 Misc 2d 262, 266; Lee v Kolb, 449 F Supp 1368, 1379.) Moreover, a prompt hearing must be held on this issue, a hearing at which a person committed under CPL 330.20 — like any other involuntarily committed patient seeking release from custody — is entitled to a jury trial. (Mental Hygiene Law, § 9.35; People ex rel. Henig v Commissioner of Mental Hygiene, 43 NY2d, at p 339, supra; People v Lally, 19 NY2d, at pp 34-35, supra.) To permit commitment of a person without such a hearing to determine his present mental condition and dangerousness would constitute a deprivation of due process and equal protection of the law. (See Bolton v Harris, 395 F2d 642, 650-652; Wilson v State, 259 Ind 375; People v McQuillan, 392 Mich *673 511; State v Krol, 68 NJ 236; State ex rel. Kovach v Schubert, 64 Wis 2d 612, app dsmd 419 US 1117, cert den 419 US 1130.)
The purpose of this hearing, characterized as a civil proceeding, is to determine whether the detainee "may be discharged or released on condition without danger to himself or others.” (CPL 330.20, subd 3.) The Appellate Division equated the standard of dangerousness under CPL 330.20 with the standard of dangerousness for involuntary civil commitment under the Mental Hygiene Law. Specifically, the court incorporated by reference the standard for involuntary admission contained in section 9.37 of the Mental Hygiene Law, which provides for the admission of
"any person who, in the opinion of the director of community services or his designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others; 'likelihood of serious harm’ shall mean:
"1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
"2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm.”
In adopting this definitional standard, however, the Appellate Division, although noting that this section requires as a condition precedent to application of the "likelihood of serious harm” test that the patient suffer a mental illness requiring immediate in-patient care and treatment, expressly held that a detainee under CPL 330.20 need not satisfy this criteria to preclude his discharge. In that court’s view, "[a] dangerous detainee [can] be confined even if not mentally ill or in need of immediate treatment, under CPL 330.20.” (66 AD2d 281, 288, n 6.) We disagree.
Unquestionably, the unique status of persons acquitted of a crime by reason of mental disease or defect permits the State to treat this "exceptional class” somewhat differently from other individuals believed suffering from mental disease or defect. Because such persons have demonstrated past antisocial behavior, the State is permitted to engage in what may be broadly termed a presumption that the causative mental *674 illness or defect continues beyond the date of the criminal conduct to the date of acquittal. (People ex rel. Henig v Commissioner of Mental Hygiene, 43 NY2d, at p 340, supra.) Of course, the flaw in viewing this principle as a true presumption is readily apparent: namely, the possibility that years may have intervened between commission of the crime charged and the date of acquittal. The significance of this contingency is further buttressed when consideration is given to the fact that in New York a lack of criminal responsibility by reason of mental illness or defect is a defense rather than an affirmative defense. (Penal Law, § 30.05.) Thus, an acquittal predicated on this ground indicates only that the People failed to prove beyond a reasonable doubt that the defendant was criminally responsible for his act and not that the jury found by a preponderance of the evidence that he was suffering from a mental disease or defect on the date of the commission of the crime charged. (Wilson v State, 259 Ind, at p 385, supra; see, also, Note, Commitment of Persons Acquitted by Reason of Insanity: The Example of the District of Columbia, 74 Col L Rev 733, 744-750.)
Thus, it may be said more accurately that the presumption flowing from an acquittal by reason of mental disease or defect does not presume that a person so acquitted presently suffers from mental disease or defect, but, rather, posits merely that having raised this defense and having previously engaged in antisocial behavior, he has demonstrated sufficient grounds for further examination to determine his present need for treatment and confinement as opposed to immediate release. (See People v McQuillan, 392 Mich 511, 527, supra.) It is for this purpose only — a prompt examination and report as to sanity — that such a person may be automatically committed to the custody of the Commissioner of Mental Hygiene upon acquittal. (People ex rel. Henig v Commissioner of Mental Hygiene, 43 NY2d, at p 339, supra; People v Lally, 19 NY2d, at p 33, supra; Wilson v State, 259 Ind, at p 386, supra; State v Krol, 68 NJ, at p 256, supra; People v McQuillan, 392 Mich, at p 528, supra; see, generally, Hamann, The Confinement and Release of Persons Acquitted by Reason of Insanity, 4 Harv J Leg 55, 65-67.)
Beyond automatic commitment of persons found not guilty by reason of mental disease or defect for a reasonable period to determine their present sanity, justification for distinctions in treatment between persons involuntarily committed under *675 the Mental Hygiene Law and persons committed under CPL 330.20 draws impermissibly thin. Clearly, the Mental Hygiene Law requires for involuntary civil commitment that the patient be mentally ill and in need of immediate in-patient treatment. Absent such a finding, a dangerous propensity is, in itself, insufficient to permit involuntary commitment. In our view, to permit commitment of a person acquitted of a crime by reason of mental disease or defect on a lesser substantive predicate would run afoul of the constitutional guarantees to due process and equal protection of the laws.
In Jackson v Indiana (406 US 715), a mentally defective deaf mute charged with two separate counts of robbery was found incompetent to stand trial and committed to the Indiana Department of Mental Health until certified sane. Counsel for Jackson contended that in seeking to commit Jackson to a mental institution indefinitely, the State should have been required to invoke the standards and procedures for commitment of "feeble-minded” or mentally ill persons provided under Indiana law. In accepting this contention, the court held "that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release * * * Indiana deprived petitioner [Jackson] of equal protection of the laws under the Fourteenth Amendment.” (406 US, at p 730, supra [footnote omitted].)[3]
In reaching this conclusion, the court relied on its prior decision in Baxstrom v Herold (383 US 107), in which the court held that a State prisoner may not be civilly committed at the expiration of his prison sentence on the finding of a Surrogate when the State affords all other civilly committed persons a jury trial on the issue of their sanity. (383 US, at p 110; see United States ex rel. Schuster v Herold, 410 F2d 1071^^^L.den 396 US 847.) "If criminal conviction and *676 imposition of sentence are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others,” reasoned the court, "the mere filing of criminal charges surely cannot suffice.” (Jackson v Indiana, 406 US, at p 724, supra.) The court then acknowledged that the Baxstrom principle had been extended to commitment upon acquittal by reason of mental disease or defect. (406 US, at p 724, supra, citing Bolton v Harris, 395 F2d 642, supra; Cameron v Mullen, 387 F2d 193; People v Lally, 19 NY2d 27, supra.)
In the present case, we deal with an individual falling conceptually between the petitioners in Baxstrom and Jackson: Torsney has been charged with a crime, has stood trial, and has been acquitted by reason of mental disease or defect. That equal protection mandates that he be afforded the same procedural rights governing his release from custody as any other involuntarily committed person is settled. Similarly, in our view, appellants’ petition for release must be measured by the same substantive standards governing involuntary civil commitment of any other individual. (See Wilson v State, 259 Ind, at p 386, supra.) Thus, we interpret CPL 330.20 as requiring a detainee’s release unless it is found that he is presently dangerous to himself or others by reason of a mental disease or defect. (See Overholser v O’Beirne, 302 F2d 852, 854-855; Starr v United States, 264 F2d 377, 382-383; Newton v Brooks, 246 Ore 484, 490; Mills v State, 256 A2d 752, 757, n 4 [Del]; State ex rel. Leeb v Wilson, 27 Ohio App 2d 1, 2-3.)
As in the case of involuntary civil commitment, it is the need for immediate in-patient treatment which justifies deprivation of liberty upon a theory of dangerousness. (See Gold-stein and Katz, Dangerousness and Mental Illness Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity, 70 Yale LJ 225, 237-239.) A showing that a detainee may be viewed as dangerous because of the prior criminal act for which he was acquitted is insufficient without more to preclude his discharge or release on condition. Distinctions in treatment of persons alleged to be mentally ill cannot rest solely upon the existence of a prior criminal charge or even conviction. (Association of the Bar, City of New York, Special Committee on the Study of the Commitment Procedures and the Law Relating to Incompetents, Second Report, Mental Illness, Due Process and the Criminal Defen *677 dant 1.) As Judge Fahy observed in Ragsdale v Overholser (281 F2d 943, 949, 950 [concurring opn]) some 19 years ago: "It is by no means clear that society can continue to deprive a person of liberty by attributing to a jury’s doubt about his mental condition, which led to his acquittal and mandatory commitment, any and all evil or criminal propensities he may be thought to have, and to keep him in confinement because of them. This would transform the hospital into a penitentiary where one could be held indefinitely for no convicted offense, and this even though the offense of which he was previously acquitted because of doubt as to his sanity might not have been one of the more serious felonies.” In the instant case, although faced with the most serious of felonies we must nonetheless be guided by this principle.
With this constitutionally mandated interpretation of CPL 330.20 in mind, we proceed to the second issue in this case: whether the weight of the credible evidence presented at the hearing requires continued confinement or release of the detainee on condition. Torsney committed the crime for which he was acquitted by reason of mental illness or defect on November 25, 1976.[4] Two psychiatrists examined him for the purpose of determining whether he lacked criminal responsibility for his act. Dr. Daniel Schwartz, Torsney’s witness, concluded that as a result of mental defect, which he diagnosed as "psychosis associated with epilepsy”, Torsney did not at the time of the offense "know or appreciate the nature, consequence and wrongfulness of his act.” Dr. Herbert Spiegel, who examined Torsney on behalf of the People, concluded quite to the contrary that although Torsney was "prone to hysterical dissociation under stress”, he was not psychotic and was criminally responsible for his act. Paralleling these findings were those of two psychologists who examined Torsney: Dr. Joy Roy voiced the opinion that Torsney’s conduct on the date of the crime was consonant with the anxiety and bewilderment which one would expect to see in an epileptic equivalent. Dr. Florence Schumer opined, however, that although Torsney "might well have responded in an impulsive and volatile manner to anticipated threat”, little in the record indicated "cognitive pathology, psychoses, or bizarre or disorganized intellective or emotional processes.”
Of course, the question whether on this proof the People *678 failed to demonstrate beyond a reasonable doubt that Torsney was criminally responsible for his act is not now material. Suffice it to say that upon the testimony produced at trial Torsney was acquitted on November 30, 1977 of the crime charged by reason of mental illness or defect. Thereupon he was admitted to Mid-Hudson Psychiatric Center on December 6, 1977, pursuant to the automatic commitment procedure contained in CPL 330.20. Torsney was examined by Dr. Mark Vandenbergh, who concluded that his reasoning and judgment was unimpaired and his insight normal. Dr. Vandenbergh found no evidence of mental disorder. Similarly, Dr. Alan Halpern, a psychologist at Mid-Hudson, who examined Torsney on December 7, determined that he suffered neither from a psychosis, a psychopathic disorder, nor from organic damage. Dr. Halpern did recommend, however, that because Torsney was a "somewhat rigid, impulsive individual”, he was not fit for duty as a beat police officer. Neither doctor believed Torsney was in need of any in-patient treatment.
Shortly thereafter, on January 6, 1978, Torsney was again examined by Dr. Vandenbergh, who found that appellant had "made an excellent adjustment to his present hospitalization.” More specifically, Dr. Vandenbergh observed that "neither before or after the offense [had Torsney] shown any signs of epilepsy”. Dr. Vandenbergh also noted that notwithstanding the neurotic emotional conflicts described in the psychological evaluations produced at trial, Torsney was symptom-free. In Dr. Vandenbergh’s opinion, he showed no symptoms of anxiety, ate and slept well and related normally to people around him, confirming his diagnostic impression that Torsney was without mental disorder.
The final examination of Torsney at Mid-Hudson Psychiatric Center occurred on February 9, 1978. This examination was conducted by Drs. Vandenbergh and Easwara Bhoothalingom, who agreed that Torsney showed no signs of mental disorder. Dr. Bhoothalingom, the Forensic Unit Chief at Mid-Hudson, noted on February 28, just prior to Torsney’s transfer to Creedmoor Psychiatric Center, that Torsney had "been cooperative with no evidence of any symptoms or signs during his stay here which point towards any potential for dangerous behavior.”
On March 3, 1978, Torsney was transferred from Mid-Hudson to Creedmoor, where he was examined upon admission by Dr. John McKnight. Dr. McKnight’s report indicated that *679 Torsney did not appear either dangerous or suicidal and that his physical condition was within "normal limits”. In April, 1978, Dr. Deborah Kaiser, Chief of Service of the Forensic Unit at Creedmoor, recommended to the Director of Creed-moor, Dr. William Werner, that Torsney be released. Accordingly, on May 19, a special release committee was convened by Dr. Werner, consisting of Drs. Joseph Sklar, Sablón Dartigue and John McKnight. It was the unanimous opinion of this committee that Torsney was not suffering from a psychosis, psychopathic disorder or organic damage and that he was not dangerous to himself or others and should be released. The committee did, however, recommend that he not be given duty as a beat police officer.
Upon receipt of this report, Dr. Werner examined Torsney and notified Dr. John Wright, Assistant Commissioner of the Department of Mental Hygiene, that in his opinion Torsney had "recovered from his psychotic episode [showed], no evidence of mental illness and [was] not considered dangerous to himself or others”. Dr. Werner concurred in the recommendation that he be discharged. At the direction of the commissioner, an independent review panel was convened to examine Torsney. This panel, consisting of two independent psychiatrists, Drs. A. Louis McGarry and Stephen Rachlin, together with a certified social worker, Rosalind Silver, found, in a report dated July 6, 1978, that Torsney "can safely be released from the hospital, without danger to himself or others. His history reveals no dangerous behavior other than the instant offense, nor has he subsequently shown any inability to control impulses, any inappropriate display of hostility, nor any behavior which might be considered threatening or dangerous. He voices no intentions to do harm to anyone and is not now mentally ill, having fully recovered from the entity which led to his [acquittal] by reason of mental disease or defect.”
Upon the submission by the Commissioner of Mental Hygiene of an application pursuant to CPL 330.20 requesting Torsney’s discharge or release on condition, the court, at the request of the District Attorney, appointed two independent forensic psychiatrists to examine Torsney and submit recommendations to the court. The first of these psychiatrists, Dr. Milton Hollar, concluded, based upon his examination of Torsney and a review of his records, that he was not psychotic; that no evidence existed to indicate that he was then dangerous to himself or others; and that no justification *680 existed for continued incarceration on psychiatric grounds. The second court-appointed psychiatrist, Dr. Stanley Portnow, similarly concluded in his report: "Mr. Torsney is neither a lunatic or a psychopath and is not a menace to others or to himself. In my opinion, there is nothing about his present mental condition which warrants his continued incarceration, and he appears to be capable of returning to a productive and useful place in society.” In view of the prior history of the case and what Dr. Portnow termed Torsney’s "questionable impulse control and inability to deal with stress”, Dr. Portnow recommended that he be gradually discharged over several weeks to ensure his satisfactory return to the community.
After receiving these reports, the court directed that a hearing be held pursuant to CPL 330.20 (subd 3). At the hearing, which ran a full nine days and at which some 18 WitheSses testified, agreement was unanimous: Torsney was not presently suffering from a mental illness or defect and Was hot a danger to himself or others. Every opinion elicited recommended that he be discharged or released on condition.
The first Witness called by the Attorney-General on behalf of the Department of Mental Hygiene, Dr. Kaiser, testified that during Torsney’s stay at Creedmoor he "exhibited no signs nor symptoms of mental illness. His reality testing [was] good, his judgment [was] good. He [showed] no impulsive behavior. He most certainly [showed] none of the usual signs that one might think of associated with mental illness such as hallucinations, delusions, poor judgment, cognitant problems, any such things. He [showed] no evidence of any such seizure disorder. In short, this person [presented] himself to us and [did] so since his admission as being normal.” Dr. Kaiser further testified that she had observed no evidence of aggressive behavior or assaultiveness on Torsney’s part. Nor had she witnessed any racial prejudice. Moreover, when questioned as to whether she had considered the effect which stress in the outside world might work on Torsney, particularly pressures flowing from the tragic prior incident, Dr. Kaiser testified that those problems had been discussed in depth and that she did not anticipate that Torsney "would become dangerous considering the stresses he may face.”
Dr. Sklar, a member of the special release committee, was called by the District Attorney and testified that upon his examination of Torsney he found him "responsive, goal-directed, mildly depressed” and that he showed "no evidence at *681 that time of an emotional disorder that required in-patient treatment from a clinical point of view.” The witness also testified that in reaching his conclusion that he was not dangerous and should be released, he took into consideration the everyday stresses of life in the community outside the hospital. Dr. Dartigue the second member of the special release committee,[5] also called by the District Attorney, reiterated his agreement with this recommendation and acknowledged that he similarly had considered stress outside the hospital. More specifically, when asked what stress outside the hospital he had considered, Dr. Dartigue responded that he had considered whether Torsney, if put in the same condition as November 25, 1976, would behave the same way. Having considered this possibility, Dr. Dartigue nonetheless recommended release.
Also testifying at the hearing were the two court-appointed independent psychiatrists. Dr. Hollar confirmed the view recommended in his report: namely, that Torsney was not psychotic and not dangerous to himself or others. Although frankly admitting a lack of infallible prescience when queried whether he could say that Mr. Torsney "in no way” had the capacity to repeat the tragic incident of November, 1976, Dr. Hollar explained that in his judgment based upon the control he had demonstrated in the hospital, psychological examinations and his own examination, Torsney was sufficiently in control of himself and he felt free in recommending his discharge.
The second independent psychiatrist, Dr. Portnow, similarly confirmed his findings and recommendation made in the previously submitted report to the court. His testimony supported that of all the other expert witnesses called: Torsney was in his judgment neither mentally ill nor dangerous to himself or others. In view of the prior incident in his history, Dr. Port-now again voiced his opinion that Torsney be released through some form of controlled release program. He acknowledged, however, that the program recommended by Dr. Kaiser, which would have required Torsney to report once a week to an outpatient clinic at the hospital so that he could be continuously evaluated for five years, was in his opinion a suitable program.
Finally, when queried as to his statement in his report *682 concerning Torsney’s "questionable impulse control”, Dr. Port-now explained that although he felt that Torsney was "an impulsive somewhat explosive individual”, he was not mentally ill. Dr. Portnow further clarified that "[ejxplosive personality is the designation given to a personality as opposed to a mental disease or defect which is described primarily as, as the instantaneous, almost without warning, explosion of effect of temperment as [sic] a particular situation.” When asked to provide a reason for his finding that Torsney had an impulsive or explosive personality, Dr. Portnow stated: "Mr. Torsney told me himself that he considered himself to be somewhat impulsive, he was an impulsive buyer, he was a man of action, given to action without thinking first and generally those are the characteristics which one would apply to an impulsive or explosive personality.”
Integrating the testimony elicited at the hearing with the proper standard for discharge or release on condition under CPL 330.20, we conclude that the weight of the credible evidence mandates that the order of the hearing court be reinstated. One thing is abundantly clear: every opinion offered at the hearing substantiated Torsney’s claim that he is neither suffering from a mental illness or defect nor dangerous to himself or others. We reject as constitutionally suspect the interpretation of CPL 330.20 given by the Appellate Division, which would permit a detainee’s continued institutionalization on a vague concept of dangerousness unrelated to mental illness or defect and for which no immediate in-patient treatment is required. As Chief Judge Bazelon cautiously observed: " '[DJangerousness’ is a many splendored thing. Unless muzzled by discriminating analysis, it is likely to weigh against nominally competing considerations the way a wolf weighs against a sheep in the same scales: even if the sheep is heavier when weighed separately, somehow the wolf always prevails when the two are weighed together. Keeping dangerousness on a taut leash is especially difficult where there is danger of murder, since the danger is admittedly grave and since its improbability, which theoretically discounts its gravity, is exceedingly difficult to quantify.” (Covington v Harris, 419 F2d 617, 627.)
An individual’s liberty cannot be deprived by "warehousing” him in a mental institution when he is not suffering from a mental illness or defect and in no need of in-patient care *683 and treatment[6] on a ground which amounts to a presumption of a dangerous propensity flowing from, as in this case, an isolated, albeit tragic, incident occurring years ago. Were this the standard for involuntary institutionalization, logical extension would require that anyone convicted of a violent crime should upon completion of his sentence similarly be required to demonstrate that he or she is not dangerous before his release into the community. (See Matter of Williams, 157 F Supp 871, 876, affd sub nom. Overholser v Williams, 252 F2d 629.) Whatever its label, confinement on a showing of mere propensity amounts to nothing more than preventive detention, a concept foreign to our constitutional order. (Cross v Harris, 418 F2d 1095, 1102; see, generally, Dershowitz, Preventive Confinement: A Suggested Framework for Constitutional Analysis, 51 Tex L Rev 1277.)
Of course, this is not to say that artificial, and perhaps theoretically implausible, lines must be drawn between concepts of mental disease or defect and other impairments of judgment. As the Appellate Division noted: "[Psychiatrists continually redefine their understanding of what a mental disease or defect is.” (66 AD2d 281, 295.) This difficulty has gained added significance since the adoption of the Durham rule as a means of determining a defendant’s criminal responsibility for his conduct pursuant to which mental illness has been construed to encompass psychopathic and sociopathic personalities. (See Goldstein and Katz, Dangerousness and Mental Illness Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity, 70 Yale LJ 225, 238.) The friction between the operation of a perhaps theoretically subjective rule permitting acquittals on something less than uniform notions of mental disease or defect and the cry of due process for objective criteria upon which to predicate continued institutionalization is amply illustrated in the case at bar. Perhaps resolution of this conflict lies in re-evaluation of the scope and applicability of the insanity defense.[7] (See, gener *684 ally, Burt, Of Mad Dogs and Scientists: The Perils of the "Criminal — Insane”, 123 U Pa L Rev 258, 280-285; German and Singer, Punishing the Not Guilty: Hospitalization of Persons Acquitted by Reason of Insanity, 29 Rutgers L Rev 1011, 1056-1058.) Given the unsettled state of the law in this area, we do not suggest that in a proper case a ’’personality disorder” which resulted in a finding of dangerousness and which required treatment would not be sufficient to preclude a detainee’s discharge or release on condition. Suffice it to say, on the present record it is clear that Torsney suffers from neither a mental illness or defect nor a personality disorder which renders him dangerous to himself or others. He should, therefore, be released pursuant to the conditions properly imposed by the hearing court.[8]
Accordingly, the order of the Appellate Division should be reversed, with costs, and the order of Supreme Court, Kings County, reinstated.

. CPL 330.20 (subd 3) provides: "If the court is satisfied that the committed person may be discharged or released on condition without danger to himself or others, the court must order his discharge, or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it must promptly order a hearing to determine whether such person may safely be discharged or released. Any such hearing shall be deemed a civil proceeding. After such a hearing, the committed person must be discharged, released on such conditions as the court determines to be necessary, or recommitted to the commissioner of mental hygiene. The commissioner of mental hygiene must make suitable provision for the care and supervision by the department of mental hygiene of persons released conditionally under this section.”

. This condition parallels CPL 330.20 (subd 4), which provides: “If within five years after the conditional release of a committed person, the court shall determine, after a hearing, that for the safety of such person or the safety of others his conditional release should be revoked, the court must forthwith order him recommitted to the commissioner of mental hygiene subject to discharge or release only in accordance with the procedure set forth in subdivisions two, three and five of this section.”

. similar reasons, the court held that due process requires that a of standing trial be institutionalized for no longer than a 'ne the probability of his regaining capacity to stand trial the event this contingency were found unlikely, "the ustomary civil commitment proceeding that would be

. Pending trial, Torsney remained free on bail, without incident.

. Dr. McKnight died prior to the hearing.

. We do not suggest, as the dissenters would have us do, that a person suffering from a mental disease or defect which is "untreatable” and who constitutes a danger to himself and society as a result of this disease or defect may not be institutionalized. In such instances it is obvious that the individual is in need of treatment. The stark reality that an effective mode of treatment has at a given point in time remained elusive does not dictate a contrary result.

. In fact, as the Appellate Division noted, there presently exists a bill in the Legislature calling for the establishment of "a special commission to investigate the history, use, medical justification, impact upon the penal system, and the effect on the *684 safety and welfare of the residents of this state of the availability and use of the defense of criminal insanity in criminal proceedings in this state.” (An Act to create a special commission to study the defense of insanity in criminal proceedings, S 1325, A 1782, 202d Sess [1979].)

. In this regard, we note that Torsney, suspended from the police department pending his trial, was dismissed from the department on June 13,1979.