OPINION OF THE COURT
Rose L. Rubin, J.
This case raises issues related to the nettlesome questions which divided the Court of Appeals four to three and which elicited three written opinions in Matter of Torsney (47 NY2d 667).
i.
In a tragic incident occurring on April 15, 1977, the defendant raped, sodomized and choked to death a 16-year- *726 old Vietnamese girl. He was indicted and charged with the crimes of murder in the second degree (two counts), rape in the first degree and sodomy in the first degree. After a nonjury trial, he was found “not responsible by reason of mental disease or defect,” by virtue of posttraumatic stress syndrome. This was predicated on evidence of defendant’s service in the United States Marine Corps in Vietnam, approximately 10 years earlier, as a member of a search and destroy unit to counteract Viet Cong terrorism and on evidence of the wide range of inhuman commando tactics in which he had become involved during that time. On July 31,1978, following the verdict, the defendant was committed to the custody of the Commissioner of the Department of Mental Hygiene and sent to Mid-Hudson Psychiatric Center. On April 27, 1979, he was transferred to the Creedmore Psychiatric Center and placed in the forensic unit, where his treating physician was Dr. Robert Damino, head of the unit. He remained there until June 11, 1981, when, following an extensive hearing upon an application for a release order before Justice Allen Beldock in which nine psychiatrists and psychologists gave evidence, an order of discharge was granted subject to continuing supervision specified in the order.
The order of conditions incorporated a written service plan prepared by Dr. Robert Damino, a psychiatrist familiar with the defendant’s case history. It provided that the defendant shall remain under the jurisdiction of the Commissioner of Mental Health for five years during which he is to attend the Clearview Community Services Clinic, Flushing, New York, once every two weeks on an outpatient basis. The clinic is to furnish the court a written progress report on the patient’s condition quarterly on the following items: (1) present mental condition; (2) change in residence; (3) name and address of employer and type of employment; (4) recommendation for hospitalization if the defendant patient’s condition deteriorates; and (5) any recommendation for hospitalization is to be reported to the court without delay, and without reference to the timing of the quarterly report. The patient is to reside with his mother and brother at their home in Flushing, Queens.
*727 Pursuant to this order, Louis Kahan was released from Creedmore on June 11, 1981, made his home with his mother, and commenced outpatient treatment at the clinic on July 1, 1981. He was hired by Creedmore under the CETA program to work as a plumber.
On August 2, 1981, an incident occurred involving one Amy Angyal which resulted in the defendant’s arrest for alleged assault. He was incarcerated awaiting trial and verdict. In examinations under CPL article 730, administered on August 17 and 19, 1981 by Dr. David Schwartz and Dr. Stanley L. Portnow, psychiatrists, he was found fit to proceed to trial. A bench trial resulted in a verdict of not guilty of assault, but guilty of harassment. He was sentenced to “time served”.
During the pendency of the trial, Dr. Damino wrote a letter to Justice Beldock, dated August 6, 1981, to which he appended affidavits by himself and Amy Angyal asserting that Louis Kahan suffered from a dangerous mental disorder and urging that he be recommitted. This position was at 180 degree variance from the position he espoused at the release hearing.
Dr. Damino’s letter and accompanying affidavits are predicate for this recommitment proceeding. On September 2, 1981, the court, sua sponte, ordered this recommitment hearing. The defendant was then transferred from the custody of the Department of Correction to the secure unit at Creedmore, where he continues to be a patient.
n.
This recommitment hearing was held pursuant to CPL 330.20 (subd 14) to determine whether or not the defendant currently suffers from a dangerous mental disorder.
The District Attorney called as witnesses Dr. Robert Damino, chief psychiatrist, Creedmore forensic unit and the defendant’s former treating physician, who testified as an expert in forensic psychiatry; Dr. Stanley L. Portnow, court-appointed independent psychiatrist, chief of the forensic unit at Bellevue Hospital and associate professor of clinical psychiatry at New York University Medical School, who testified as an expert in forensic psychiatry; Dr. Eileen Bloomingdale, clinical psychologist, assistant *728 professor of psychology at New York Medical School, who testified as an expert in psychological diagnosis; Dr. Frederick Covan, chief psychologist at Bellevue Hospital, who testified as an expert in forensic psychology; and Dr. Abraham Halpern, court-appointed independent psychiatrist, director of psychiatry at United Hospital, Port Chester, New York, who testified as an expert in forensic psychiatry.
The defendant called as witnesses Dr. Barbara Kirwin, chief of services, secure unit, Creedmore, who testified as an expert in clinical psychology, more specifically, dangerous mental illness; James Audubon, supervising psychologist, Creedmore, who testified as an expert in the field of psychological testing of forensic patients; Dr. Madhu Malhotra, staff psychiatrist of the outpatient division, Creed-more, who testified as an expert psychiatrist; Dr. Charles White, the defendant’s treating psychologist in the outpatient clinic, Creedmore; Dr. Daniel Schwartz, director of forensic psychiatry, Kings County Hospital and associate professor of psychiatry at Downstate Medical Center, who testified as an expert in forensic psychiatry; Dr. Ruth Finch, forensic psychiatrist at Kings County Hospital, who testified as an expert in forensic psychiatry; and Mrs. Edith Kahan, the patient’s mother.
Dr. Schwartz, Dr. Damino and Mr. Audubon had also testified at the first hearing.
in.
In assessing whether the defendant currently suffers from a dangerous mental disorder (CPL 330.20, subd 1, par [c]) or is mentally ill (CPL 330.20, subd 1, par [d]), an examination of his personal life at the time of his arrest on August 4, 1981 is instructive. Absent the incident of August 2, 1981 which led to his arrest and the reversal of Dr. Damino’s opinion, this hearing would not have been ordered. The facts adduced at this hearing were previously undisclosed to the court.
During separate interview examinations by Drs. Schwartz, Malhotra and Halpern, the defendant informed each that Dr. Damino had introduced him to Amy Angyal approximately 14 or 15 months before his release. Thereaf *729 ter she came frequently to Creedmore and the two would spend an hour alone during her visits.
After his release, the defendant went to Amy Angyal’s home on weekends. Both his mother and Dr. Damino knew where he was. Indeed, Dr. Damino joined them on Saturday afternoons and the three spent the balance of the day together. After the fourth weekend, Kahan asked Amy Angyal to marry him and she accepted his proposal. News of the engagement was not well received by Dr. Damino.
Dr. Damino had been married to Angyal’s identical twin sister. Each sister had been his patient. According to Kahan, Angyal told him that she had a 15-year relationship with Dr. Damino, before, during and after his marriage to her sister. She said that she had filed an assault complaint against Dr. Damino in 1978 but that he had persuaded her to withdraw it. Dr. Halpern testified that Angyal told him that she failed to keep her first appointment with him in October, 1981 because she was assaulted and bruised by Dr. Damino.
The Sunday after the engagement, August 2,1981, was a hectic day for Louis Kahan. Upon awakening, he discovered that while he slept, Angyal had met a suitor and brought back a gift from him. In his anger, Kahan pushed Angyal by the shoulders to the bed, put his hands on her neck, but did not hurt her. With reference to this incident, Dr. Halpern testified that he regards it as both an act of violence and an act of controlled behavior. He considers it significant that, in the face of considerable provocation, Kahan did not seriously injure Angyal.
During that morning, Dr. Damino telephoned and ordered Kahan out of the house, challenging his right to disrupt Dr. Damino’s relationship with Amy Angyal. He called the police, who arrived shortly thereafter. When Angyal insisted that she wanted Kahan to stay, the police had her sign a statement to that effect. Dr. Damino called twice more. Angyal asked Kahan to stay. Many of these facts are corroborated by the testimony of Dr. Damino.
The next day, Kahan reported the incident to Drs. Malhotra and White, who advised him not to see Dr. Damino or Angyal and to return the next day for further examination. *730 On August 4, the next day, the defendant returned to the outpatient clinic as instructed. He was arrested later that day on an assault complaint signed by Angyal. It was after trial on this complaint that he was acquitted of the charge and convicted of the lesser included offense of harassment, a violation.
After the trial and pending the CPL 330.20 hearing which the court had ordered, the defendant was placed in a secure unit at Creedmore which, according to Dr. Kirwin, chief of services, consists of “35 highly aggressive males. He is in danger of physical injury at all times”. Without medication, the patient, she testified, functioned at a normal level under “stressful and dangerous circumstances”. Dr. Covan testified that Kahan made an “excellent adjustment” to the stress of living on a locked ward for “violent and psychotic patients”. Indeed, as of November 15, 1981, he was granted escorted ground privileges, after interview by the forensic committee of the hospital. These privileges have not been abused.
IV.
In the signing the 1980 bill which created the new CPL 330.20, entitled “Procedure following verdict or plea of not responsible by reason of mental disease or defect”, Governor Hugh L. Carey wrote in his approval memorandum: “This legislation establishes well balanced pre-trial, trial and post-trial procedures in the event a defendant asserts a defense of ‘not responsible by reason of mental disease or defect’. These procedures will better ensure the protection of the public from future dangerous acts of individuals found not responsible, while safeguarding' the rights of such individuals.” (NY Legis Ann, 1980, p 219.)
The difficult public policy questions articulated in Torsney (47 NY2d 667, supra), and embodied in this statute require a balancing of the right of the community to be secure as against the right of a perpetrator of a violent act to be free from confinement where there has been no criminal conviction and the perpetrator is no longer violent. Interest in this issue is undoubtedly heightened by the much-publicized trial conducted almost contemporaneously with this hearing involving the shooting of the *731 President of the United States and others, following which a jury found the defendant not guilty by reason of insanity.
CPL 330.20 embodies the determinations of the Legislature regarding these troublesome issues and is controlling. In pertinent part, it reads as follows:
“1. Definition of terms, as used in this section, the following terms shall have the following meanings * * *
“(c) ‘Dangerous mental disorder’ means: (i) that a defendant currently suffers from a ‘mental disease’ as that term is defined in subdivision twenty of section 1.03 of the hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others.
“(d) ‘Mentally ill’ means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant’s welfare and that his judgment is so impaired that he is unable to understand the needs for such care and treatment * * *
“14. Recommitment order. At any time during the period covered by an order of conditions an application may be made by the commissioner or the district attorney to the court that issued such order, or to a superior court in the county where the defendant is then residing, for a recommitment order when the applicant is of the view that the defendant has a dangerous medical disorder. The applicant must give written notice of the application to the defendant, counsel for the defendant, and the mental health information service, and if the applicant is the commissioner he must give such notice to the district attorney or if the applicant is the district attorney he must give such notice to the commissioner. Upon receipt of such application the court must order the defendant to appear before it for a hearing to determine if the defendant has a dangerous mental disorder * * * The court must conduct a hearing to determine whether the defendant has a dangerous mental disorder. At such hearing, the district attorney must establish to the satisfaction of the court that the defendant has a dangerous mental disorder. If the court finds that the *732 defendant has a dangerous mental disorder, it must issue a recommitment order.”
In fact, the proceedings immediately before the court are not covered by the specific terms of subdivision 14. Neither the District Attorney nor the Commissioner of Mental Health has filed an application for an order of recommitment. Instead, the court, by its order of September 4,1981, acted sua sponte. No objection has been taken to such procedure by any party and each has participated fully in the hearing. Each party stipulated that this court has jurisdiction to conduct the hearing and requested that it continue to do so. Any claim of defect in the proceedings is, therefore, waived.
v.
CPL 330.20 (subd 14) directs the court to “conduct a hearing to determine whether the defendant has a dangerous mental disorder.” At the hearing the District Attorney “must establish to the satisfaction of the court that the defendant has a dangerous mental disorder.” (CPL 330.20, subd 14.) If the court finds in the affirmative, it must issue a recommitment order. While the burden of proof is on the District Attorney, the statute fails to spell out the quantum of proof necessary to meet this burden of proof.
In his 1980 Supplementary Practice Commentary (McKinney’s Cons Laws of NY, Book 11A, 1981-1982 Pocket Part, CPL 330.20, p 15), Professor Joseph W. Bellacosa refers to the provisions relating to a plea or verdict of not responsible by reason of mental disease or defect as “new and complex”. “Key to an understanding of these commitments, transfer, furlough, release procedures” he writes, “is the attempt to conform these procedures to civil commitments for the most part”. (Id.)
“The whole scheme is premised on the prosecutor’s burden, presumably civil in nature and therefore preponderance, to satisfy the court as to each level of commitment or change in status.” (Ibid., p 16.) Inasmuch as Kahan is not simply another involuntary patient in a mental health institution, the court agrees with Professor Bellacosa’s characterization of these proceedings as “quasi-civil”. (Id.)
*733 The same issue confronted the Court of Appeals in Torsney (47 NY2d 667, 671, supra) as follows: “On this appeal, two issues are presented for our review. The threshold issue is whether the Appellate Division properly construed the standard for release of persons held in the custody of the Commissioner of the Department of Mental Hygiene pursuant to CPL 330.20. Contingent upon resolution of this issue is the second issue: namely, whether evaluated under the proper standard for release the weight of the credible evidence presented at the hearing requires the detainee’s continued confinement, discharge or release on condition.” The Court of Appeals again refers (p 677) to the “weight of the credible evidence presented at the hearing” as the standard of proof for determining the issue of continued confinement or release of the detainee on condition.
The Court of Appeals refers (supra, p 672) to persons acquitted under CPL 330.20 as an “‘exceptional class’” who may be treated somewhat differently from other persons involuntarily committed under the Mental Hygiene Law. The Legislature recognized this distinction when it simultaneously enacted CPL 60.55 (L 1980, ch 548), which permits admission into evidence on this issue of an otherwise privileged communication between a psychiatrist or a licensed psychologist and a defendant who raises the defense of lack of criminal responsibility by reason of mental disease or defect.
Thus, this court concludes that the hearing is uniquely quasi civil in nature and that the District Attorney’s burden of proof is by a preponderance of the credible evidence, to the satisfaction of the court.
vi.
It is highly significant that none of the 11 well-qualified experts, by their testimony or reports, was of the opinion that the defendant currently suffers from a dangerous mental disorder. In this respect, the witnesses called by the District Attorney do not differ from the witnesses called by the defendant. Nor were any of the expert witnesses, including those called by the District Attorney, of the opinion that the defendant requires inpatient treatment. Four of the expert witnesses called by the District Attor *734 ney, namely, Drs. Portnow, Halpern, Bloomingdale and Co van, were of the opinion that the defendant suffers from á mental disease, as defined in subdivision 20 of section 1.03 of the Mental Hygiene Law, but that he does not currently constitute a physical danger to himself and others.
Of those witnesses who were asked if they observed any change or deterioration in the defendant’s condition between the date of his release on June 17,1981 and the date of the incident on August 2,1981 or thereafter, all, namely, Drs. Malhotra, White, Schwartz, Damino, Portnow, and Mr. Audubon, responded in the negative. It is apparent to the court that the incident which triggered this hearing did not occur because of any deterioration in the defendant’s condition.
It is noteworthy that Dr. Damino again reversed himself at the hearing and returned to his original opinion that Louis Kahan is neither presently suffering from a dangerous mental disorder nor is he mentally ill.
According to Dr. Halpern, the defendant has been examined by a battery of tests and interviews administered by qualified psychiatrists and psychologists on 22 occasions. Some of the witnesses read all of the resulting reports as well as the two sets of hospital records before testifying. All of the witnesses read some of the reports and records prior to their testimony.
What constitutes a dangerous mental disorder is a question of law.
Whether the defendant has a dangerous mental disorder is a question on which the opinion of the expert witnesses is instructive. The statute lays down a two-pronged test by using the conjunctive, “and” (CPL 330.20, subd 1, par [c]). In the face of expert opinion and in the absence of persuasive facts to the contrary, the court finds that the defendant does not currently suffer from a mental illness and that he does not currently constitute a physical danger to himself or others. The District Attorney has failed to meet his burden.
*735 VII.
The evidence discloses that the defendant is a man of intelligence and of higher than average verbal skills. The experts are in agreement that he is learning how to cope with his frustrations and violence. He will suffer a breakdown, if at all, only after prolonged depression. Such development can be monitored by frequent outpatient treatments which will mitigate adverse consequences. Regular reports to the court by the treating physician should assist in producing optimum appropriate care, including, if required, medication and group therapy in a group which includes female as well as male patients.
Accordingly, the District Attorney’s application for an order of recommitment is denied, and it is ordered that the defendant be released in conformity with the order of conditions entered by this court dated June 11, 1981, except that:
A. Paragraph No. 1 is amended to delete the words “once every two weeks”. The following words are added to Paragraph No. 1, following the words “New York,”: twice every week for a period of three months. Thereafter the defendant is to attend the Clearview Community Services Clinic on an outpatient basis once a week for a minimum of one year. Any modification of the frequency of his visits is to be effectuated only with the prior written authorization of the court.
B. Paragraph No. 3 is deleted and the following new Paragraph No. 3 is substituted:
The psychiatrist or psychologist assigned as the primary therapist to the defendant patient shall render a written report to the court once a month on the first day of each month for the first six months and quarterly thereafter. The reports shall also be mailed to Dr. Abraham Halpern, who volunteered to render a written assessment of the reports to the court. The progress report on the defendant’s condition shall include, but is not limited to the following:
(a) The defendant’s present mental condition;
(b) Any change in the defendant’s residence;
*736 (c) The name and address of the patient’s present employer and the type of employment in which the defendant is engaged;
(d) A recommendation that the defendant patient be hospitalized if his condition deteriorates to the point that such hospitalization is required to protect the defendant and/or the community, or for the welfare of the defendant patient; and
(e) Such recommendation for hospitalization is to be reported to the court without delay, without regard for the date of the quarterly report.
C. The following conditions are added:
4. The defendant shall not consume any alcoholic beverages.
5. The defendant shall not ingest or take in any other form, any illicit substance or drug, including marihuana.
6. The defendant shall not communicate with or receive any communication from Amy Angyal or Dr. Robert Damino. He shall report any communications from Ms. Angyal or Dr. Damino to his treating psychiatrist or psychologist, who shall immediately communicate such information to the court.
7. Failure by the defendant to keep a scheduled appointment at the Clearview Community Services Clinic shall be immediately reported to the court by his treating psychiatrist or psychologist.
8. In the event that the defendant breaches any of the conditions, he shall immediately be recommitted to Creed-more Psychiatric Center, pending a hearing.
VIII.
The defendant moves to seal this record under CPL 330.20 (subd 17) which accords “a defendant committed to the custody of the commissioner pursuant to this section * * * the rights granted to patients under the mental hygiene law.” The District Attorney opposes.
Subdivision (f) of section 9.31 of the Mental Hygiene Law provides for the sealing of papers in hearings involving patients who are involuntarily admitted on medical certification. This procedure is here inapplicable since this hear *737 ing does not involve a case of involuntary admission on medical certification.
Highly persuasive is the absence from the Law Revision Commission report, which comprises an intense study of the insanity defense and upon the recommendation of which the 1980 repeal of the prior CPL 330.20 and the enactment of the current provisions are based, of a recommendation for sealing of the records of hearings. The Criminal Procedure Law contains no such provision. The decision in Torsney (47 NY2d 667, supra) does not provide for sealing. Indeed, the issue was not previously raised with respect to Louis Kahan. The proceedings at his trial formed the basis of a book called Aftershock: The Story of Two Victims, written by David Howard Bain. The proceedings and record of the first hearings resulted, as did the trial, in an extensive public record of defendant’s psychiatric condition. Additionally, defendant made no motion to exclude the public during the hearing. The information he now seeks to seal was available to any interested person throughout the hearing. In light of the strong public policy for trials in open court, applications for limitations on public access, even by a defendant, should be sparingly granted (People v Jones, 82 AD2d 674) and only when unusual circumstances demand it. (People v Jones, 47 NY2d 409). Defendant’s application is without merit, except as to the hospital records which were introduced into evidence. The hospital records are sealed. Defendant’s motion to seal is otherwise denied.