OPINION OF THE COURT
Walter T. Gorman, J.
decision/order
On December 2, 1982, the petitioner, Commissioner of Mental Health, filed with this court the instant application seeking issuance of a first retention order pursuant to CPL 330.20 (subd 8). The Cortland County District Attorney* advised via letter of December 8, 1982, that he would not contest the application nor would that office request a hearing regarding the defendant’s present mental status.
Following some confusion with respect to his not having an attorney to represent him, one was appointed. After several conferences with his attorney, the defendant requested that a hearing be held to determine his current *299 mental condition, as is his right under CPL 330.20 (subd 8).
The hearing was held on March 9 and 10, 1983. The petitioner called two witnesses: Drs. Thomas Falci and Janette Albrecht, both Hutchings Psychiatric Center psychiatrists. The defendant testified in his own behalf and called Dr. Karl Newton, his attending psychiatrist at Hutchings.
Based upon the evidence presented at this hearing, the following findings of fact and conclusions of law are made.
FINDINGS OF FACT
On May 26, 1982, the defendant was committed to the care and custody of the State Commissioner of Mental Health pursuant to a commitment order issued by the Cortland County Court (Mullen, J., presiding) under CPL 330.20 (subd 6) which held that the defendant then suffered from a dangerous mental disorder.
The defendant is currently a patient at the Hutchings Psychiatric Center Forensic Unit. The instant application seeks retention of the defendant in this secure facility, it being the petitioner’s position that the defendant still suffers from a “ ‘[djangerous mental disorder’ ” as that term is defined in CPL 330.20 (subd 1, par [c]).
The defendant, of course, challenges this assertion, contending that while he suffers from a mental illness, he is not suffering from a dangerous mental disorder and should, therefore, be transferred to a civil, nonsecure unit.
CONCLUSIONS OF LAW
Although there has been some confusion in the past concerning the quantum of proof applicable in CPL 330.20 hearings (compare People v Kahan, 115 Misc 2d 725, 733, and People v Plaksin, 107 Misc 2d 696, 698 [preponderance of the evidence], with Matter of Rose, 109 Misc 2d 960, 973, and People v Escobar, 110 Misc 2d 1089, 1093 [clear and convincing evidence]), the controversy now appears settled. Both the First and the Fourth Departments of the Appellate Division have held that the appropriate standard is that of “clear and convincing” evidence. (People v Escobar, 90 AD2d 322, 329, modfg 110 Misc 2d 1089, supra; Matter of Buthy, 90 AD2d 689.)
*300 The defendant contended during his argument at the conclusion of the hearing, and in a posthearing letter to the court, that the primary issue underlying the hearing is the definition to be used for the term “dangerous mental disorder”. Simply stated, the defendant contends that the test contained in section 9.37 (subd [a], pars 1, 2) of the Mental Hygiene Law should be used rather than the definitional test of CPL 330.20. As authority for this proposition, the defendant cites two cases: Matter of Torsney (47 NY2d 667) and People v Escobar (90 AD2d 322, supra).
The Torsney case was possibly the single most important precipitating factor underlying the enactment of the Insanity Defense Reform Act of 1980 (L 1980, ch 548). That act repealed the old CPL 330.20, replacing it with an entirely new and complex system for dealing with situations such as present here. Torsney, then, in specifically dealing with the old CPL 330.20 must be considered in that context only and not given undue weight in issues presented under the new CPL 330.20.
The Escobar court made the following statement (supra, p 328): “[T]he purpose for the [1980] revision was to conform these [CPL 330.20] proceedings to those for civil commitments.” The defendant would seem to contend that such language reflects a position that 330.20 proceedings are civil in nature, thereby requiring that the Mental Hygiene Law tests should be applied rather than those of the Criminal Procedure Law. This, however, is not the case for a number of reasons.
First of all, in making this statement, the Escobar court was concerned only with the quantum of proof to be employed in 330.20 proceedings. Specifically, the Escobar court held that due process and equal protection required that the same standard — clear and convincing evidence — be used in 330.20 commitments as is employed in involuntary commitments. (Supra, at p 329; citing Matter of Torsney, supra; Addington v Texas, 441 US 418.) But, the court did not state that 330.20 proceedings are civil, and in point of fact, did not even go so far as to label them “ ‘quasi-civil’ ” as did the court in People v Kahan (supra, at p 732; citing with approval Bellacosa, 1980, Supplementary Prac *301 tice Commentary, McKinney’s Cons Laws of NY, Book 11 A, 1981-1982 Pocket Part, CPL 330.20, p 15).
Next, in examining the statutory mechanism itself, it is clear that its enactment was intended to serve a dual purpose. That is, it was felt that the new procedures would “better ensure the protection of the public from future dangerous acts of individuals found not responsible, while safeguarding the rights of such individuals.” (Governor’s Approval Memorandum, L 1980, ch 548, NY Legis Ann, 1980, p 219.) In this context, it is helpful to compare CPL 330.20 with its counterpart in the Mental Hygiene Law, section 9.37 (subd [a], par 1).
CPL 330.20 (subd 1) provides definitions of various terms to be “used in this section”. Among these definitions is that for “dangerous mental disorder”, found in CPL 330.20 (subd 1, par [c]). That paragraph reads as follows: “ ‘Dangerous mental disorder’ means: (i) that a defendant currently suffers from a ‘mental illness’ as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others.”
Subdivision 20 of section 1.03 of the Mental Hygiene Law defines “mental illness” as: “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.”
These definitions, when combined, provide for the use of a two-prong test to determine whether a defendant suffers from a “dangerous mental disorder”. The commissioner must prove to the satisfaction of the court:
(1) that the defendant is afflicted with a mental disease or condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that he requires care, treatment and rehabilitation; and
(2) that because of such condition, he currently constitutes a physical danger to himself or others.
*302 The Mental Hygiene Law does not specifically define “dangerous mental disorder”, as the Criminal Procedure Law does. However, subdivision (a) of section 9.37 of the Mental Hygiene Law does provide a definition for “ ‘likelihood of serious harm’ ”. That term means:
“1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
“2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical. harm.”
Careful examination and comparison of these two provisions reveals that the Mental Hygiene Law is much more difficult than that under the Criminal Procedure Law. In particular, the former provides a litany of factors that must be proved, while the latter supplies only general concepts. Thus, it stands to reason that, since the quantum of proof is the same — clear and convincing evidence — the more particularized burden is heavier under the Mental Hygiene Law. This conclusion seems to be precisely what the Legislature contemplated in enacting the 1980 Insanity Defense Reform Act.
This conclusion is further supported by a similar comparison of the definitions of “mental illness” in subdivision 20 of section 1.03 of the Mental Hygiene Law and of “mentally ill” in CPL 330.20 (subd 1, par [d]). Once again, the Mental Hygiene Law is more specific than the Criminal Procedure Law, thus increasing the burden with respect to a particular person’s mental status.
In drafting an extremely complex statutory scheme, the Legislature provided for the procedures to be employed during each stage in the commitment process. Only in a very few instances did the Legislature incorporate the Mental Hygiene Law. (See, e.g., CPL 330.20, subds 7 [initial civil commitment order], 12 [release order], 16 [rehearing and review].) Even in so doing, these references to the Mental Hygiene Law do not work a change on the defendant’s status — he remains a 330.20 patient, as *303 opposed to a patient involuntarily committed pursuant to article 9 of the Mental Hygiene Law. As such, the statutory plan must be strictly construed, particularly where there is no ambiguity as to the legislative intent.
Thus, in applying the two-prong test to determine whether the defendant, Eric Fleszar, suffers from a “dangerous mental disorder”, there was presented at the hearing clear and convincing evidence to satisfy both prongs.
The petitioner’s two psychiatrists testified at the hearing that they felt that the defendant was dangerously mentally ill and, therefore, recommended his continued retention in the secure, forensic unit. They both premised their opinions on the defendant’s actions while a patient at Hutchings, in particular, striking out at fellow patients and staff members, his lack of remorse for the stabbing incident that resulted in his initial commitment to Hutchings, and his inability to control his impulses and his anger.
The defendant’s attending physician/psychiatrist, Dr. Karl Newton, testified that he felt that the defendant’s mental illness was in remission and that he is, therefore, not currently dangerous. He attributed this change in defendant’s status to the medication which the defendant is now taking, albeit in small doses. However, this position is taken after only a matter of months (from his initial commitment in late May of 1982 to present) and under less than ideal clinical conditions — it was revealed that the psychiatric staff was for some time working with an incomplete psychiatric/social history on the defendant.
The defendant, in testifying at the hearing, evinced many of the personality traits cited by Drs. Falci and Albrecht as the basis for their opinion. Although not outwardly hostile, the defendant was overly quiet, cautious and uneasy. He did not seem remorseful about his previous actions and, indeed, admitted the incidents involving other patients and staff, contending that he was just joking around.
Thus, the above-named defendant having been found not responsible by reason of mental disease or defect and having been committed to the custody of the State Commissioner of Mental Health for confinement in a secure *304 facility for a period of six months for care and treatment pursuant to a commitment order issued under the provisions of CPL 330.20 (subd 6) by the Cortland County Court on May 26, 1982;
And, pursuant to the aforesaid commitment order, the above-named defendant being currently confined in Hutchings Psychiatric Center Regional Forensic Unit, a secure facility of the State Office of Mental Health;
And, the period prescribed in the aforesaid commitment order expiring on November 26, 1982;
And, an application having been made pursuant to CPL 330.20 (subd 8) by the State Commissioner of Mental Health for a first retention order to authorize the continued custody of the above-named defendant by the Commissioner of Mental Health for a period not to exceed one year from the date of expiration of the aforesaid commitment order;
And, a demand for a hearing having been made and such hearing having been held on March 9 and 10, 1983;
And, due deliberation thereon having been had;
And, the court, having found that the above-named defendant currently suffers from a dangerous mental disorder as that term is defined in CPL 330.20 (subd 1, par [c]);
It is hereby
Ordered that the Commissioner of Mental Health is authorized to continue custody of the above-named defendant for care and treatment for a period not to exceed one year from the expiration of the period prescribed in the aforesaid commitment order under which the above-named defendant is being currently confined in the aforesaid secured facility of the State Office of Mental Health.

 The defendant, Eric Fleszar, was originally prosecuted in Cortland County on charges of assault in the second degree and criminal possession of a weapon in the fourth degree. This application is before this court because the defendant is presently a patient at the Hutchings Psychiatric Center Forensic Unit, which is located in Onondaga County.