THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
JAIME ESCOBAR, Respondent.

First Department, December 7, 1982

APPEARANCES OF COUNSEL

*Philip Foglia* of counsel (*Steven R. Kartagener* and *Seth
L. Marvin* with him on the brief; *Mario Merola, District
Attorney,* attorney), for appellant.

*Malvina Nathanson* of counsel (*Caesar D. Cirigliano,*
attorney), for respondent.

OPINION OF THE COURT

KUPFERMAN, J. P.

This appeal by the District Attorney from a release order and order of conditions (CPL 330.20, subd 12) presents both factual and legal issues under the Insanity Defense Reform Act of 1980. (L 1980, ch 548, as amd.) With that enactment, the Legislature passed a revised and greatly expanded CPL 330.20. The purpose of the revision was to afford persons detained after a court has found them not responsible with respect to criminal charges the same procedural protections as the Mental Hygiene Law provides for persons involuntarily committed civilly.

The order appealed from transfers the respondent, Jaime Escobar, from Mid-Hudson Psychiatric Center, a maximum security facility, to L.A.B.O.R. Community Residences Program, Inc., a community-based treatment program.[1] The order incorporates an order of conditions drawn up by a psychiatrist hired by counsel for respondent. Pursuant to this order of conditions, respondent will continue to participate in the program until it is mutually agreed between respondent and the program's director that respondent no longer requires the services offered. We are informed that respondent is currently participating in that program.

Respondent's troubled history points up the need for some greater societal protection than that afforded by the order of conditions. Currently 23 years of age, Jaime Escobar was the youngest of four children. His two brothers are currently serving life sentences for the murder of a policeman. His parents separated when he was 10. His father died when he was 13. By his early teens, respondent had begun the drug abuse from which many of his problems developed. He began with alcohol and marihuana, then progressed into more dangerous drugs including heroin, amphetamines and cocaine. He supported his dependence by acting as a courier of cocaine making deliveries to other boroughs in the City of New York, until, by his own

---

1. L.A.B.O.R. stands for League of Autonomous Bronx Organizations Renewal.

The program, funded by the Human Resources Administration of the City of New York, provides the respondent with an apartment which he shares with other participants in The Bronx. He is required to attend full-time daily counseling and therapy sessions at the South Bronx Mental Health Clinic.

account,[2] he was shot in the leg "by the competition" in 1979.

Escobar was previously hospitalized at least twice in psychiatric wards suffering from delusions. He was in Jacobi Hospital in June and July, 1977, and in East Tremont Hospital in May and June, 1979. In 1975, Escobar was arrested for breaking and entering for which he spent six months at Lincoln Hall and three months at Gala House. In 1978, Escobar was arrested for assault, menacing, and possession of a .38 caliber handgun, for which he spent eight months at Rikers Island and one year on probation. He had belonged to two youth gangs in The Bronx and used the alias "Karate".

These proceedings stem from an incident which occurred on May 22, 1980. Escobar was arrested for unlawfully entering his victim's apartment and stabbing his sleeping victim in the neck in a personal vendetta. Escobar related to his psychiatrist that he had been drinking at the time of the assault, that he was angry at his victim and meant to hurt him because he didn't like him saying "that he pulled his gun on me at one time". He stated further, "I stabbed this Miguel guy, I never got along with Miguel anyway".

Two psychiatrists at the Bronx Criminal Court Psychiatric Clinic found that Escobar lacked capacity to stand trial. He reported hearing voices and suffering from paranoid fears. The psychiatric report indicated that the prognosis was poor, citing residual and disabling symptoms.

On July 28, 1980, Escobar was first admitted to Mid-Hudson. Upon his admission, Escobar related, "I feel nervous sometimes, feel like hurting someone, voices on T.V. tell me everything will be alright." After less than three months at Mid-Hudson, where Escobar was kept on medication in a structured ward environment, his thought disorder had improved so that he was certified competent to stand trial.

Escobar spent the winter of 1981 at Rikers Island awaiting trial. In May, 1981, the court found Escobar not respon-

---

**2.** All statements attributed to Escobar are taken from interview notes made by psychiatrists who examined him.

sible with respect to the crimes charged. On June 1, 1981, the court signed an examination order.[3]

On June 8, 1981, Escobar was again sent to Mid-Hudson. Dr. Mark Vandenbergh, his attending psychiatrist, found him arrogant and manipulative in the initial interview based on remarks made by the patient. The patient related, "I hate this place very much. I hate being locked up, I need privacy. On the outside I was asocial — a loner. I used many types of drugs: cocaine, 'black beauties': that's Dexedrine. I've been using drugs for years. I had stopped using cocaine and drinking alcohol and I used Dexedrine, it helped me very much. I could use some right now, but I'd better not as long as I am locked up. I do get nervous as a result of drugs, although there is no reason to be."

On October 16, 1981, the court in a well reasoned opinion, issued a commitment order[4] for a six-month period after finding that Escobar was not criminally responsible for the offenses charged due to mental disease or defect, and that at the time of commitment he was suffering from a dangerous mental disorder. (*People v Escobar,* 110 Misc 2d 1089 [REINSTEIN, J.].) Respondent then brought a habeas corpus petition challenging the validity of his commitment. This court affirmed the denial of that petition, without opinion, on April 2, 1982.

At the commitment hearing, beginning in September, 1981, three psychiatrists submitted reports, two for the People and one for the defendant. Though there was agreement that Escobar was mentally ill at that time, only the psychiatrists for the People maintained that Escobar was suffering from a dangerous mental disorder.[5]

---

**3.** CPL 330.20 (subd 1, par [e]) defines an examination order as "an order directed to the commissioner requiring that a defendant submit to a psychiatric examination to determine whether the defendant has a dangerous mental disorder, or if he does not have [a] dangerous mental disorder, whether he is mentally ill."

**4.** CPL 330.20 (subd 1, par [f]) defines a commitment order as "an order committing a defendant to the custody of the commissioner for confinement in a secure facility for care and treatment for six months from the date of the order."

**5.** " 'Dangerous mental disorder' means: (i) that a defendant currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others." (CPL 330.20, subd 1, par [c].)

Dr. Vandenbergh reported to the court that Escobar was suffering from a mixed personality disorder. (See Asch, Mental Disability in Civil Practice, §§ 2.5, 2.17, 2.31; see, also, Diagnostic and Statistical Manual of Mental Disorders III [Amer Psychiatric Assn, 1980], pp 320-321.) This personality disorder, according to Dr. Vandenbergh, centered around respondent's egocentric and antisocial traits and was aggravated by mixed substance abuse as well as a lack of insight into the nature of the act which he committed. By insight, the doctor explained, in later testimony, that he meant an adequate appreciation and balanced judgment with respect to the assault. Dr. Vandenberg cited the casual attitude toward violence displayed by Escobar and noted his lack of inner controls that would prevent him from committing violent acts. He concluded that Escobar is "prone to dangerousness when he has access to drugs".

Dr. Paul Chellappa, a staff psychiatrist at Mid-Hudson, stated in a report submitted to the court that Escobar suffered from a substance-induced mixed organic mental disorder as well as a schizoid personality. Dr. Chellappa cited Escobar's repeated conflicts with the law, his lack of remorse, and his total lack of insight to conclude that Escobar required maximum security psychiatric treatment for his chronic antisocial disorder complicated by drug abuse.

Dr. Robert Goldstein, also a psychiatrist, submitted a report on behalf of the defendant. He found, based on a two-hour examination, that Escobar was mentally ill but not dangerous. He diagnosed paranoid schizophrenia which was in remission at that time because Escobar was not then abusing drugs.

Respondent was returned to Mid-Hudson where Dr. Vandenbergh again became his attending psychiatrist. In March, 1982, Dr. Vandenbergh noted that Escobar was a sociopathic individual trying to pose as a reformed charac-

---

" 'Mentally ill' means that, a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment". (CPL 330.20, subd 1, par [d].)

ter, that he totally lacked insight and had made no progress.

In April, 1982, the District Attorney moved to consolidate the proceedings for a first retention order[6] under CPL 330.20 with the proceedings under section 9.35 of the Mental Hygiene Law which affords a jury trial on the issue of mental illness. The motion to consolidate was granted, and respondent waived his right to a jury trial.

In the consolidated proceedings, Drs. Vandenbergh and Chellappa testified as to their opinions that the respondent was dangerously mentally ill. A psychiatrist for the respondent, Dr. Azariah Eshkenazi, testified, on the basis of a 90-minute interview with respondent and a review of his records, that he was neither mentally ill nor dangerous. Dr. Vandenbergh averred that, due to the lack of insight and egocentricity of the respondent, his sociopathic condition was one of the most untreatable disorders because "they don't think they have any problems". Dr. Vandenbergh recommended long term in-patient treatment at a maximum security facility as the best treatment plan.

At the conclusion of testimony, the court found that Escobar was no longer suffering from mental illness or a dangerous mental disorder at that time, although the court confirmed that he had such conditions as of the date of original commitment. The court requested that an order of conditions be submitted by both the People and respondent, but only respondent's psychiatrist had submitted such an order of conditions by the date set. Thereupon, on

6. CPL 330.20 (subd 8) provides that the Commissioner of Mental Health must move for either a first retention order or a release order within 30 days of the expiration of the commitment order. It provides in relevant part that the court must conduct a hearing "if a demand therefor is made by the district attorney, the defendant, counsel for the defendant, or the mental health information service within ten days from the date that notice of the application was given to them. At such hearing, the district attorney must establish to the satisfaction of the court that the defendant has a dangerous mental disorder or is mentally ill. If the court finds that the defendant has a dangerous mental disorder it must issue a first retention order. If the court finds that the defendant is mentally ill but does not have a dangerous mental disorder, it must issue a first retention order and, pursuant to subdivision eleven of this section, a transfer order and an order of conditions. If the court finds that the defendant does not have a dangerous mental disorder and is not mentally ill, it must issue a release order and an order of conditions pursuant to subdivision twelve of this section."

July 8, 1982, the court issued the release order appealed from.

The District Attorney served a notice of appeal and so informed the court, requesting the automatic stay under CPLR 5519 (subd [a], par 1). However, the court was of the opinion that with the enactment of the 1980 revisions, the CPL 330.20 postcommitment proceedings had been converted to criminal proceedings and thus the staying provisions of CPLR 5519 were inapplicable. The court then stayed its order for 72 hours to allow the People to seek appellate relief, which they chose not to do. Then, on July 12, 1982, the court ordered Escobar released pursuant to the order of conditions.

■ Counsel for respondent argues that when the Legislature enacted the Insanity Defense Reform Act of 1980, they converted the proceedings under CPL 330.20 from civil to criminal proceedings. If this were so, this appeal would not lie in favor of the District Attorney absent statutory authority. (*Santangello v People,* 38 NY2d 536.) In support of this construction, respondent's counsel argues that the revised statute no longer contains the provision in former CPL 330.20 (subd 3) that such hearings will be deemed a civil proceeding. We find no such legislative intent to convert these proceedings from civil to criminal. Rather, the purpose for the revision was to conform these proceedings to those for civil commitments. (See Bellacosa, 1980 Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPLR 330.20, p 17, 1982-1983 Pocket Part; see, also, Report and Recommendations by the Special Committee to Study Commitment Procedures and the Law Relating to Incompetents [Assn of Bar of City of NY], in Mental Illness, Due Process and the Acquitted Defendant,[7] pp 5-6, 11-13, 21-26.) The District Attorney, of

---

7. The report noted in regard to the prior version of CPL 330.20:

"There is no reason for excluding acquitted patients from the notice, review and hearing procedures which extend to patients both under the Mental Hygiene Law as to civil patients and under the Criminal Procedure Law as to criminal defendants found to be incapacitated. Since acquitees are in fact no longer in the criminal justice system, they are entitled to civil patient status and to the same procedures as civil patients. Section 330.20 fails to provide such procedures.

course, has standing to represent the People in such proceedings. (L 1982, ch 526, § 1, as amdg CPL 330.20, subd 8.)

The District Attorney argues on this appeal that it was improper for the hearing courts, both at the commitment hearing and the release hearing, to impose the clear and convincing proof standard on the People. This contention was put to rest by the United States Supreme Court in *Addington v Texas* (441 US 418). That case held that the due process clause of the Fourteenth Amendment requires a "clear and convincing" standard of proof for involuntary civil commitment of an individual to a State mental hospital.

In *Matter of Torsney* (47 NY2d 667), the New York Court of Appeals held that equal protection of the law requires that persons committed as a result of a finding that they lacked criminal responsibility because of mental disease must be treated in the same manner as those committed civilly, with the narrow exception that persons found not criminally responsible may be automatically committed for a prompt examination and report as to sanity. (*Supra,* at p 674.) *Addington* (*supra*) overrules the former New York rule (see, e.g., *Matter of Lublin v Central Islip Psychiatric Center,* 43 NY2d 341, 345), that people committed after acquittal from criminal charges because of mental disease or defect bore the burden of proving by a preponderance that they may be released without danger to themselves or others.

The District Attorney also argues on this appeal that the order of conditions is legally insufficient, because it was not prepared by a psychiatrist "familiar"[8] with the case and because the program selected is not one in which the Commissioner of Mental Health can monitor respondent's

"The New York Court of Appeals in its veiled warning in *Henig* [*People ex rel. Henig v Commissioner of Mental Hygiene,* 43 NY2d 334, 338] has indicated that the threat of unconstitutionality hovers over section 330.20. The federal courts are also indicating that section 330.20 is constitutionally defective." (Report and Recommendations, *op. cit.,* at p 12.)

8. CPL 330.20 (subd 12) provides in relevant part, "The order of conditions issued in conjunction with a release order shall incorporate a written service plan prepared by a psychiatrist familiar with the defendant's case history and approved by the court, and shall contain any conditions that the court determines to be reasonably necessary or appropriate."

progress and compliance. Though the procedure whereby respondent's hired expert prepared the order of conditions is not to be commended, here the People were afforded the opportunity also to submit such an order, which they failed to do. The commissioner was informed of respondent's placement and is in a position to oversee respondent's participation in the program.

■ Finally, the argument by the District Attorney that the court's finding that respondent was suffering from neither a mental illness nor a dangerous mental disorder was based on insufficient evidence because of Dr. Eshkenazi's minimal familiarity with respondent is insufficient for reversal of the release order. The Court of Appeals has held that a patient cannot be confined indefinitely as dangerous on the basis of a single, isolated, violent act. (*Matter of Torsney,* 47 NY2d, at pp 682-683.) Though here there is more than the isolated violent act referred to in *Torsney,* whether respondent was still seriously mentally ill at the time of the release order is a matter of medical conjecture. Since most of his mental problems have been related to drug and alcohol abuse, it is not surprising that his condition may have improved after more than two years of forced abstinence. His attending psychiatrist has conceded the relative inability of his profession to treat sociopathic disorders which require excessively long periods of in-patient therapy.

Nonetheless, in light of the dangerous propensity demonstrated by this respondent, the order of conditions should be modified to delete the provision that respondent and the director of the program can mutually agree to his release. In its place, the order of conditions should provide that a court hearing be held with respect to respondent's ultimate release and that the Commissioner of Mental Health be made a party to that hearing. At such hearing, the court should consider, in the interests of the respondent and the community, long-term treatment measures to insure that this respondent does not regress into the substance abuse which has been his nemesis.

The release order and order of conditions should be modified, on the law and the facts, to delete the release

provision as noted above, and as modified, affirmed, without costs.

SULLIVAN, ROSS, ASCH and ALEXANDER, JJ., concur.

Order, Supreme Court, Bronx County, entered on July 9, 1982, unanimously modified, on the law and the facts, to delete the release provision as noted in the opinion herein, and as modified, affirmed, without costs and without disbursements.