OPINION OF THE COURT
Stuart Namm, J.
Defendant, Melvina Langlois, charged with the reckless murder (Penal Law, § 125.25, subd 2) of her infant daughter who drowned on January 10,1983, entered a plea of not responsible by reason of mental disease or defect to the indictment with the consent of the prosecution and with the acceptance of the court. (Penal Law, § 30.05; CPL 220.15.)
Thereafter, a hearing mandated by CPL 330.20 (subd 6) was conducted by the court on December 14, 1983, and *1019 continued on January 20, 1984, to determine whether she has a dangerous mental disorder (CPL 330.20, subd 1, par [c]), and if found not to have a dangerous mental disorder, to determine whether she was mentally ill. (CPL 330.20, subd 1, par [d].)
HEARING TESTIMONY
At the hearing, Dr. Marie Gross, a psychiatrist for 18 years and “board” certified since 1978, testified that she had examined the defendant for a period of two hours on October 4, 1983. Based upon this clinical interview of the defendant which included an interpretation of proverbs, a standard test employed in the medical profession to assess a mental disorder, and a narrative of the events told to her by the defendant which focused upon the period of January 8, 1983 to January 10, 1983, Dr. Gross concluded that the defendant was suffering from what she termed a dangerous mental disorder. She diagnosed the defendant as suffering from a “Brief Reactive Psychosis,” which she defined as an acute psychosis resulting from a stressful situation.
Dr. Gross later spoke with the defendant a second time for a period of 25 minutes during the week prior to testifying at the instant hearing. Dr. , Gross stated that the mental condition of the defendant had not changed since her first interview, and again concluded that the defendant was still suffering from a dangerous mental disorder. She characterized the defendant’s attitude as “negativistic and uncooperative” at the time of the second interview.
Dr. Gross based her present opinion upon several factors: (1) the defendant’s lack of display of any feelings of guilt or remorse towards the death of her daughter; (2) the defendant’s lack of any emotions, or bland affect, which Dr. Gross characterized, in the words of Sigmund Freud, as “la belle indifference”; (3) her diagnosis that the defendant suffered a “Brief Reactive Psychosis”, an acute psychotic state, at the time of the January 10, 1983 incident when the defendant claims that voices of spirits drove her and her daughter into the waters of Long Island Sound; (4) an underlying “histrionic personality disorder” whereby she is easily influenced by others, coupled with a tendency to overreact to a situation and to sexualize nonsexual situations; and (5) a preoccupation with and a belief in spirits. *1020 Most significantly, Dr. Gross was of the firm opinion that if the defendant were confronted with a stressful situation similar to that which confronted her at or about January 10, 1983, she would probably repeat her behavior, that is, she would again likely overreact in a pathological way to any moderately stressful event. She concluded that the defendant was not only mentally ill, but was dangerous to herself and others.
The defendant was also independently examined by a second psychiatrist, Dr. Janet Lim, who is not a “board” certified psychiatrist. Dr. Lim stated that she graduated from medical school in 1961, and had actively practiced medicine until 1980, when she then entered a three-year residency program in psychiatry at the Middletown Psychiatric Center which she successfully completed. Licensed to practice medicine in the State of New York, Dr. Lim began her employment at the Mid-Hudson Psychiatric Center in July, 1983. Prior to her examination of the defendant, Dr. Lim had examined two other patients as a staff psychiatrist to determine their dangerousness and had testified as a qualified expert in a court proceeding in Supreme Court, New York County, on one previous occasion.
Dr. Lim interviewed the defendant on three separate occasions with each interview lasting 30 to 45 minutes in duration. Relying upon the events of January 10, 1983, as described by the defendant and information provided by the defendant’s sister, Dr. Lim was also of the opinion that the defendant presently suffers from a dangerous mental disorder. Her diagnosis remained unchanged after seeing the defendant again in December, 1983.
Her opinion, reached without consultation with and independent of Dr. Gross, was based upon the defendant’s “flat affect”, i.e., her lack of a feeling of guilt, sadness or remorse about the death of her daughter; her concrete thinking ability (proverb interpretation); the defendant’s inadequate display of judgment; the psychotic manifestations exhibited by her at the time of the January, 1983 incident; her recent depressive moods; all coupled with her prior delusional thoughts which place the blame for her daughter’s death upon “the force of the spirit.” Dr. Lira’s *1021 diagnosis was that the defendant had suffered a “Brief Reactive Psychosis” on January 10, 1983, and that while her symptoms had seemingly receded, she remained a danger to herself or to others.
defendant’s argument
Defendant contends that (1) Dr. Lim was not qualified to render a psychiatric opinion of the defendant since she was not “board” certified; (2) the “history” of how the events of January 10,1983 occurred as described by the defendant to the examining psychiatrists is an inadequate basis to support their opinion that the defendant presently suffers from a dangerous mental disorder; and (3) the evidence adduced at the hearing failed to demonstrate that she was suffering from a present dangerous mental disorder.
FINDINGS OF FACT AND CONCLUSIONS OF LAW QUALIFICATIONS OF DR. LIM
A “qualified psychiatrist” includes any physician who is a diplómate of the American Board of Psychiatry and Neurology (hereinafter referred to as the Board) or who is eligible to be certified by that Board. (CPL 330.20, subd 1, par [q].) Although Dr. Lim has not been certified as a diplómate by the American Board of Psychiatry and Neurology, the court finds that her experience and training, which is uncontroverted in the record, is sufficient to render her eligible to be certified as such if she were to submit an application for Board certification.
In resolving the question of the eligibility of Dr. Lim for certification as a diplómate by the Board, the court has taken judicial notice sua sponte of the general eligibility requirements promulgated by the American Board of Psychiatry and Neurology, Inc., which must be met at the time of the submission of an application for certification as a diplómate. (See Directory of Medical Specialties, Marquis Who’s Who, 1983-1984 [21 ed], pp 2914-2920.)
Judicial notice is the knowledge which a court will officially take of a fact, although no evidence to prove that fact has been introduced. (Richardson, Evidence [10th ed], § 8.) In determining such facts, a court may resort to such documents, references and other repositories of information as are worthy of belief and confidence and may be *1022 taken by the court on its own motion in the absence of a specific request by a party. (Richardson, Evidence, op. cit., §§ 10, 14.)
Accordingly, the court finds that in order to submit an application for examination and certification in psychiatry by the American Board of Psychiatry and Neurology, Inc., an applicant must be a physician who has an unlimited license to practice medicine granted by a State and who has satisfactorily completed the Board’s specialized train-, ing requirements in psychiatry or neurology, or both. Before entering such an approved three-year training program in psychiatry, a physician must have also completed one year of approved training after receiving the degree of Doctor of Medicine. (Directory of Medical Specialties, op. cit., p 2915 et seq.)
A review of the educational background, training and experience of Dr. Lim clearly establishes that she meets the eligibility criteria outlined above, and the court finds that she is eligible for diplómate certification in psychiatry by the Board. Therefore, the court concludes as a matter of law that she is a “qualified psychiatrist” as that term is defined by statute. (CPL 330.20, subd 1, par [q].)
In resolving this issue, the court notes that the legislation enacted does not require that the defendant be examined by two qualified psychiatrists. CPL 330.20 (subd 2) permits the commissioner to designate a licensed psychologist, in lieu of a second psychiatrist, to conduct the examination of a defendant to determine whether he has a dangerous mental disorder, or, if not, to determine whether he is mentally ill. It would seem, therefore, that if the Legislature saw fit to permit such examination to be conducted by one “qualified psychiatrist”, i.e., Board certified, and by one “licensed psychologist”, in lieu of two qualified psychiatrists, that, even if Dr. Lim were not a “qualified psychiatrist”, within the meaning of the law, her qualifications as a medical doctor practicing psychiatry would make her more qualified than even a licensed psychologist to conduct such examination.
For all of the foregoing reasons, the request by the defendant that the court reject the psychiatric opinion evidence presented at the hearing through the testimony of Dr. Lim is denied.
*1023 RELIANCE UPON HISTORICAL EVENTS AS A MEANS OF PSYCHIATRIC DIAGNOSIS
The defendant’s argument that the use by both examining psychiatrists of information imparted to them during their interviews of the defendant (the case history) was an inadequate basis for reaching their individual opinions that the defendant presently suffers from a dangerous mental disorder is unpersuasive and without merit.
In conducting a mental status examination a psychiatrist “may employ any method which is accepted by the medical profession for the examination of persons alleged to be suffering from a dangerous mental disorder”. (CPL 330.20, subd 2.)
“Psychiatric diagnosis is largely a process of grouping symptoms into familiar and statistically well-established patterns * * * The delineation of these clinical patterns is based upon information obtained from psychiatric personal history and ‘mental status’ examination.” (Blinder, Psychiatry in the Everyday Practice of Law [2d ed], § 3.1.) Both doctors testified that the “history” of the case taken from the defendant and others was an integral part of the defendant’s mental status examination.
In gathering data concerning a patient’s history, a major area of inquiry usually focuses upon the individual’s present difficulty in order to enable the examiner to determine a subject’s perception of the facts. A psychiatrist listens not only to what is being said but how it is said. (Blinder, op. cit., § 3.2.) An understanding of the past events, particularly as perceived by the person being examined, is crucial in determining the present mental status of that individual.
The court concludes that the methods employed by both psychiatrists who examined the defendant and their reliance upon the “history” of the case as described by the defendant was certainly a proper and valuable tool to aid them in their diagnosis of her current mental condition. The testimony of both psychiatrists clearly demonstrates that their opinions were based upon their objective observations of the defendant’s appearance and her manner of response to their inquiries as well as the “factual” histori *1024 cal events related by the defendant to them, and that their individual conclusions were not based upon “history” alone.
While this would appear to have been a single, violent, isolated act resulting in the death of the defendant’s daughter, and the same may not permit her continued institutionalization for an indefinite period of time; where the incident occurred little more than one year ago; and where the defendant continues to claim that the “voices of spirits” caused the death of her daughter; and further, where two qualified psychiatrists attest to her dangerousness, there is nothing in the record which would justify any lesser finding at this time. (See Matter of Torsney, 47 NY2d 667.)
STANDARD AND BURDEN OF PROOF
Although the statute in New York is silent regarding the precise nature and quantum of proof needed to satisfy a court that an individual presently suffers from a dangerous mental disorder (see Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 330.20, p 23), the court followed the “clear and convincing evidence” standard adopted by two appellate courts. (People v Escobar, 90 AD2d 322; Matter of Estes, 75 AD2d 451.)
The evidence adduced before the court consisting of the testimony of two psychiatrists who independently evaluated the present mental condition of the defendant was credible and uncontroverted. Both were of the opinion that the defendant is currently suffering from a dangerous mental disorder which conclusion, the court finds, was based upon their objective, independent observations of the defendant and their employment of generally accepted methods recognized by the medical profession to aid in the diagnosis of an individual’s mental condition.
The defendant did not offer the expert opinion of another psychiatrist to controvert the conclusions of Drs. Gross and Lim, nor did she offer any other evidence for the court to conclude that she is not presently suffering from a dangerous mental disorder.
On the evidence adduced at the initial hearing, the court finds that the prosecution has proven, by clear and con *1025 vincing evidence that the defendant is currently suffering from a dangerous mental disorder.
Accordingly, the clerk of the court is directed to prepare the appropriate commitment order mandated by CPL 330.20 (subd 6) for signature by the court.