OPINION OF THE COURT
Harold Baer, Jr., J.
After a jury trial in November, 1983, the defendant was found not responsible for the crimes charged against him by reason of mental disease or defect. Shortly thereafter, this court signed an order pursuant to CPL 330.20 requiring that the defendant submit to a psychiatric examination. The purpose of such an examination is to determine whether the defendant had a dangerous mental disorder or is mentally ill.[1] There had been extensive testimony at *432 trial where the People’s effort was to prove beyond a reasonable doubt that the defendant’s conduct was not a result of mental disease or defect and that the defendant did not lack substantial capacity to know or appreciate the nature and consequence of that conduct or that such conduct was wrong. (See Penal Law, § 30.05.)
The defendant was charged with two counts of attempted murder in the second degree, two counts of assault in the second degree and four counts of assault in the third degree, all of the charges having grown out of a series of events which occurred on November 4, 1982 and resulted in the shooting and wounding of two men at Beth Israel Hospital. Both men were known to the defendant and had been his colleagues when he had worked at the hospital. The defendant left the hospital’s employ in late 1979, having attained the position of Director of Internal Audits. The defendant is a 47-year-old Caucasian male, a CPA with a Master’s degree in industrial management.
At a posttrial hearing pursuant to CPL 330.20, the roles of respective counsel were somewhat different. The People called two psychiatrists at the hearing that commenced on April 16, 1984 and was adjourned and concluded on April 23, 1984. Both psychiatrists, Dr. Paul Chellappa and Dr. Beneb Ting, had examined the defendant at Mid-Hudson Psychiatric Center over a period of some 30 days, basically during the month of January of this year. The jury verdict of not responsible was rendered on December 21, 1983. Both psychiatrists testified to having reviewed the voluminous medical reports admitted into evidence during the trial, as well as the pertinent portions of the trial transcript.
Dr. Chellappa found that the defendant becomes threatening and angry when under stress, and that stress reacti *433 vates periods of depression. Dr. Chellappa’s report went on to conclude: “Mr. Barry Simowitz is a man with a mood disorder aggravated by stress in spite of previous treatment. He had been preoccupied with guns and death of himself or others or both for several years and actually acted upon it in November 1982 with contingency plans. He tends to become erratic, despondent and revengeful. He needs stabilization of this disorder and understanding of the need for further psychiatric treatment so that he can function without resorting to violence or preoccupation with violence. He is learning to understand that stress precipitates and complicates his recurrent depression. He still needs continued inpatient, involuntary psychiatric treatment. The patient is afflicted with a dangerous mental disorder. Major Depressive Disorder Recurrent 296.30.”
Dr. Ting testified that during the course of his examination the defendant showed no degree of remorse and a lack of insight. He believes that the defendant needs further psychotherapy and that he has not yet come to grips with the fact of his illness. He has no ability to deal with stress and insufficient ability to deal with problems. He concludes his report with the following language: “Although a long period had elapsed since the incident Mr. Simowitz still harbors residual anger and depression. His ability to handle stress is poor. In view of previous dangerous behavior exhibited by the patient and his mildly improved condition, his lack of insight and remorse feelings towards the incident, he is still considered to be suffering from a dangerous mental disorder at present and it is recommended that he should be hospitalized in a secure facility until improvement is shown in his condition.” In short, both psychiatrists called by the People found that the defendant suffers from a dangerous mental disorder.
The defendant called Dr. Judith Shaw, who testified to having a Ph. D. in clinical psychology, course work in normal and abnormal psychology and that she has been an adjunct professor in the field of normal and abnormal psychology for 10 or 12 years. She had reviewed the reports of Drs. Chellappa and Ting and described their reports as adversary in nature rather than as treatment oriented. Basically, it was her testimony that neither of the People’s *434 psychiatrists nor anyone else can truly forecast dangerousness, nor can anyone be certain that an individual has a dangerous mental disorder. Dr. Shaw opined that she could not say the defendant is suffering from a dangerous mental disorder. Her testimony served to highlight the cross-examination of defense counsel to the effect that dangerousness was hard to predict. In one volume relied on by defense counsel we read: “Whatever may be said for the reliability and validity of psychiatric judgments in general, there is literally no evidence that psychiatrists reliably and accurately can predict dangerous behavior. To the contrary, such predictions are wrong more often than they are right. It is inconceivable that a judgment could be considered an‘expert’ judgment when it is less accurate than the flip of a coin.” (Schwitzgebel, Prediction of Dangerousness and Its Implications for Treatment, in Modern Legal Medicine, Psychiatry & Forensic Science, pp 783, 785 [W. Curran, A. L. McGarry & C. Retty; 1982 ed].)
Although a determination of dangerousness continues to present a thorny issue in New York, the reduced burden of proof as enunciated recently by the Court of Appeals, makes this decision somewhat simpler. On March 30,1984, that court for the first time interpreted the burden of proof in such hearings and held that under the Insanity Defense Reform Act of 1980 (L 1980, ch 548, as amd) the burden of proof continues to rest with the People, but that the standard is a preponderance of the credible evidence. (People v Escobar, 61 NY2d 431.) Prior decisional law in lower courts had held that the People, to prevail, must meet the test with clear and convincing proof. (See, e.g., People v Escobar, 110 Misc 2d 1089; see, also, People v Escobar, 90 AD2d 322, revd 61 NY2d 431; see Note, Commitment Following An Insanity Acquittal, 94 Harv L Rev 605.)
Although the defense argument merits inquiry and may warrant legislative attention, it is insufficient on this record to overcome the lesser burden recently fashioned by the Court of Appeals in Escobar.
Because a determination as to dangerousness is not an easy one regardless of the burden of proof, it seems worthwhile to note some of the steps this court took to reach a decision to deny the motion to strike the testimony of the *435 People’s psychiatrists and to order the commitment of the defendant.[2] Should counsel on both sides address these issues, it may simplify future determinations. This is not to suggest that the following constitutes an exhaustive catalogue of what may be the relevant issues at other such hearings.
1. Collect and analyze pedigree information, e.g., age plays a role in the harm the defendant may be able to do to himself or others. In this case, the defendant is relatively young and in good physical condition. Age, when coupled with the onset of certain mental illness, may help predict the time between significant periods of depression, etc.
2. What was the date of onset of illness? The fact that the defendant has a long history of mental illness and has been in treatment for eight years, is a factor that suggests that he is unlikely to have recovered in the few months since the trial.
3. Were there any emotional and developmental or physical precursors of the defendant’s present illness? Connected to this inquiry might be the sub-inquiry: Does he have meaningful emotional relationships of current importance to him? There was testimony that in 1975 the defendant had experienced a loss of consciousness which had necessitated his being taken to a hospital emergency room. When he regained consciousness, he was unable to speak and this aphasia persisted for approximately one hour. A CAT scan at first indicated an astro cytoma in the left ventricle, and the defendant was told that his prognosis was guarded and that he had very little time to live. This had a significant effect on the defendant’s psyche, even though a second CAT scan proved negative. On another occasion, he was in a motorcycle accident on the Long Island Expressway and may have lost consciousness for a period of time. As early as 1979, he had difficulty sleeping and became anoretic. He became irritable and short tempered, and by late 1979, he felt so disfunctional that he *436 sought a leave of absence, but felt that he was indispensable. The fact is he was becoming less and less productive, although ofttimes working literally 24 hours a day. By November, 1979, he was so disfunctional that he went on sick leave and returned to Beth Israel Hospital only to commit the crimes for which he was tried. His psychiatrist began to make “house calls” and was treating the defendant with chemotherapy, primarily with Lembitrol, a drug containing a combination of Librium and Elavil. All of these facts suggest to this court serious mental illness which resulted in the admitted wrongdoing. This inquiry takes into account and is guided by the notion that the defendant’s prior criminal act is insufficient without more to support commitment. (See Association of the Bar, City of New York, Special Committee on the Study of the Commitment Procedures and the Law Relating to Incompetents, 2d Rep, 1 Mental Illness, Due Process & the Criminal Defendant.)
4. What are the predisposing factors, if any, which might let one know that the defendant was about to have another breakdown? This is important simply because if we do not know what the predisposing factors are, there would be a lessened possibility of treating or predicting and hospitalizing the defendant when he might be about to cause harm again, either to himself or others. In this case, the deep depression was easily diagnosed and should be recognizable were it to reoccur. This finding tends to support the prospect of out-patient treatment at the proper time.
5. Has the defendant while an out-patient had recurring “attacks” and, if so, have they required hospitalization, and how has the defendant managed, or has he been symptom-free, and, if so, for how long? In this case, the defendant, as I view the record, has not been symptom-free for some time; hospitalization was recommended at least once, but the defendant declined to enter the hospital. Unfortunately, this suggests to me that were the defendant in an out-patient status, and hospitalization was recommended, it might require a court order and take some time. The crimes here were committed only days after the defendant’s psychiatrist recommended hospitalization. Such a history militates against out-patient treatment at this juncture.
*437 6. Do we know of an effective treatment for the defendant’s illness? This, too, creates a concern for the court. Although treated with a variety of drugs for a long period of time and with some concurrent therapy, the treatment was apparently wrong, or, alternatively, the defendant is not amenable to treatment. In either event, for some time prior to the commission of the crime, treatment was extended and it did not work, or at least it did not work so as to avoid the commission of this wrongdoing.
Finally, prior to the next mandated hearing, both sides should explore a treatment plan that might be acceptable to the defendant and at the same time one that will insure the safety of the public.
Accordingly, a commitment order shall be issued committing the defendant to the custody of the State Commissioner of Mental Health for confinement in a secure facility for care and treatment for six months from the date of this order. Defendant, if he is so advised, may obtain a rehearing and review of this proceeding and said commitment order in accordance with the provisions of CPL 330.20 (subd 16) and section 9.35 of the Mental Hygiene Law.

. CPL 330.20 (subd 6) provides in pertinent part as follows: “Initial hearing; commitment order. After the examination reports are submitted, the court must, within ten days of the receipt of such reports, conduct an initial hearing to determine the defendant’s present mental condition. * * * At such initial hearing, the district attorney must establish to the satisfaction of the court that the defendant has a dangerous mental disorder or is mentally ill.” As defined in CPL 330.20 (subd 1, par [c]): “ ‘Dangerous mental disorder’ means: (i) that a defendant currently suffers from a ‘mental illness’ as *432 that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others.” As defined in CPL 330.20 (subd 1, par [d]): “ ‘Mentally ill’ means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant’s welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment”. “Mental illness” is defined in subdivision 20 of section 1.03 of the Mental Hygiene Law as “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.”

. CPL 330.20 (subd 1, par [f|) provides: “ ‘Commitment order’ or ‘recommitment order’ means an order committing a defendant to the custody of the commissioner for confinement in a secure facility for care and treatment for six months from the date of the order.” CPL 330.20 (subd 8) requires the State Commissioner of Mental Health or of Mental Retardation and Developmental Disability to seek a retention order at least 30 days prior to the expiration of the six-month period and upon request, a hearing to determine whether the defendant has a dangerous mental disorder or is mentally ill.