*168 OPINION OF THE COURT
Richard T. Andrias, J.
Defendant Richard Goodman, a former law clerk in the Civil Court, was indicted for the crimes of attempted murder in the second degree and assault in the first degree arising out of the stabbing of a co-worker on September 19, 1991 in the courthouse at 111 Centre Street. Mr. Goodman entered the office of his supervisor, Jack Baer, the Chief Clerk of Civil Court, and lunged at him with a knife stating, "You ruined my life. Jack Baer made my wife leave me. Jack Baer tried to kill me.” Mr. Goodman stabbed Mr. Baer in the arm and severed tendons in his hand. Immediately following the incident, Mr. Goodman was seized, arrested and taken to Bellevue Hospital.
On September 29, 1993 before this court, defendant Goodman entered a plea of not responsible by reason of mental disease or defect pursuant to CPL 220.15. With the People’s consent, the plea covered the entire indictment. After extensive proceedings wherein the court inquired into defendant Goodman’s mental condition, the court accepted the plea.
Following entry of the plea, the court immediately issued an order pursuant to subdivision (3) of CPL 330.20 directing the New York State Office of Mental Health (OMH) to report to the court its findings and evaluation concerning defendant’s mental condition. Given the passage of time since the incident, the court was particularly interested in the opinions of mental health experts concerning the defendant’s present condition, that is, whether or not defendant was "mentally ill” or was suffering from a "dangerous mental disorder” as those terms are defined in paragraphs (c) and (d) of CPL 330.20 (1):
"(c) 'Dangerous mental disorder’ means: (i) that a defendant currently suffers from a 'mental illness’ as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others.
"(d) 'Mentally ill’ means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant’s welfare and that his judgment is so *169 impaired that he is unable to understand the need for such care and treatment.”*
Because defendant Goodman was not in custody at the time of the plea, at his request and despite the People’s objection the court ordered the CPL 330.20 examination to be conducted on an out-patient basis as authorized in subdivision (3). However, OMH insisted that an in-patient examination was essential for a proper evaluation and the court modified its original order and directed an in-patient examination.
Pursuant to the court’s order, defendant Goodman underwent psychiatric examinations at the New York Psychiatric Institute at Columbia Presbyterian Medical Center between January 18, 1994 and February 3, 1994. At the close of the examination period, a report was issued to the court by the psychotherapists who evaluated the defendant.
In their report, the psychotherapists expressed some uncertainty about defendant Goodman’s specific diagnosis but concluded that his psychiatric history and current clinical state were "most consistent” with a diagnosis of schizoaffective disorder, depressed type. (It was noted that defendant’s various prior hospital admissions included diagnoses of schizophrenia, schizoaffective disorder and major depression with psychotic features.) The psychotherapists found that defendant clearly has a very serious illness with a "waxing and waning course”, with episodes of paranoid psychosis and at least one incident of violent behavior.
The report recommended continuing treatment due to the severity of defendant’s illness, the incident of violent behavior and his "persistent paranoia and guardedness” as well as his general denial of his illness. However, the examiners did not *170 find that the defendant suffered from a "dangerous mental disorder” or a "mental illness” as defined by paragraphs (c) and (d) of CPL 330.20 (1), which would have required that he be treated on an in-patient basis at a psychiatric facility. Rather, their findings led the psychotherapists to recommend maintenance antipsychotic treatment (i.e., medication) as a prophylactic measure to prevent further psychotic episodes, as well as weekly out-patient visits with a psychiatrist or psychologist to treat and monitor his mental status.
Following the issuance of the evaluation report, the court held an evidentiary hearing pursuant to CPL 330.20 (6) to determine defendant Goodman’s present mental condition.
On March 21, April 4 and April 5, 1994, Dr. Ewald Horwath of the New York Psychiatric Institute testified for the People. Dr. Horwath diagnosed the defendant as having a mental illness, but not one requiring in-patient treatment as defined in paragraph (d) of CPL 330.20 (1). Dr. Horwath noted, however, that when defendant Goodman fails to take his medication and discontinues therapy, which has happened at different intervals, he has had psychotic relapses. Dr. Horwath further testified that defendant’s paranoia currently persists and consequently he does need out-patient treatment and antipsychotic medication.
On May 27, 1994, defendant’s therapist Dr. Robert Gould testified on his patient’s behalf. Dr. Gould testified that he had been treating defendant for seven or eight months with intensive psychotherapy while gradually withdrawing him from antipsychotic medication. In Dr. Gould’s opinion, the elimination of the medication resulted in a marked improvement in defendant’s condition to the point where he was able to return to work as a paralegal on a full-time basis. In comparison to the testimony of Dr. Horwath, Dr. Gould minimized defendant’s illness which he diagnosed as depression. He strenuously disagreed with any diagnosis of schizoaffective disorder or psychosis and with Dr. Horwath’s recommendation to maintain defendant on antipsychotic medication which Dr. Gould believed caused severe side effects and made defendant Goodman "unable to work”, "drowsy” and "foggy.” In Dr. Gould’s opinion, defendant Goodman had improved considerably with psychotherapy but did not benefit from the antipsychotic medication which appeared to result in more negative than positive effects.
Questioned with regard to defendant’s violent behavior in *171 September 1991, Dr. Gould testified that he considered the stabbing an "episodic” rather than a "chronic” event. Based on his months of clinical work with the defendant, Dr. Gould testified that defendant is presently "beyond the point of doing violence.” Nevertheless, Dr. Gould did recommend that defendant continue out-patient psychotherapy "as long as he is improving with it”, and he expressed the belief that when defendant’s financial problems with his ex-wife resolve, his depression will "lift”.
On May 27, 1994, defendant’s family counselor Dr. Monte Weinstein testified briefly that, in his opinion, defendant Goodman was not a danger to himself or to the community. However, Dr. Weinstein failed to make available to the court or to the prosecution his file on defendant and the court therefore will not consider his testimony.
On June 24, 1994, the court heard the testimony of the defendant, Richard Goodman. At this hearing, the defendant demonstrated the "guardedness” described by numerous examiners and denied that he was suffering from any mental illness more serious than mild depression. While insisting that all of his hospital admissions in the past were voluntary, he consistently denied or downplayed the reported events that preceded those admissions. For example, when questioned about an incident in May 1992 when he reportedly ran into trafile and was thereafter admitted to the Payne Whitney Clinic, defendant insisted he had not run into the trafile but professed not to remember what led to his clinic admission. In fact, according to the defendant he either never knew or could not remember any reason for any previous hospitalization.
Further examples of guardedness and denial were observed during cross-examination. Defendant claimed to have no recollection of incidents in his workplace where co-workers complained of his staring and belching in the halls for long periods, no recollection of typing and signing a letter complaining about a co-worker, and no recollection of the stabbing of Mr. Baer. During a consultation with a doctor retained by the defense some months after the incident, defendant was able to describe his mental state at the time of the stabbing. However, at the hearing he claimed not to remember any of the things he had said to this doctor. Pressed to explain his comment in the psychotherapists’ report that he was sorry about the stabbing, defendant said he knew it was the wrong thing to do and that he would not have done it if he had not been "out of my mind”.
*172 In fact, the court noted at least six discrete areas where the defendant either denied or did not recall significant events in his mental history. It is the opinion of the court that, despite his general denial of serious mental impairment, defendant’s paranoia does indeed persist. Furthermore, due to the described periods of waxing and waning in his condition and the fact that he did at least once engage in unprovoked, serious violent behavior, some measure of supervision and oversight should remain in effect for a substantial period of time. Based upon the evidence adduced at the hearing, the court makes the following conclusions of law.
CONCLUSIONS OF LAW
The court finds that the defendant, Richard Goodman, has a mental illness which requires continued out-patient supervision, although his condition does not constitute either a "dangerous mental disorder” or a "mental illness” requiring inpatient treatment as defined in CPL 330.20 (1) (c) and (d). This finding is based on all of the various reports and testimony of witnesses, none of whom recommend in-patient treatment of defendant Goodman.
In spite of the lack of any expert support for their contention, the People claim that the defendant is "mentally ill” and suffers from a "dangerous mental disorder,” that he is a danger to himself and others and requires in-patient psychiatric care. While the court is convinced that defendant suffers from a serious mental illness and is troubled by defendant’s apparent lack of insight into and general denial of the severity of his problems, the court does not agree with the People’s contention that Mr. Goodman’s condition requires that he be committed to the custody of the Commissioner of Mental Hygiene. In arriving at this opinion, the court relies heavily on the psychiatric evaluations and testimony given at the hearing, particularly the opinion of Dr. Horwath, the psychotherapist from New York Psychiatric Institute at Columbia Presbyterian Medical Center, who found the defendant to have a mental illness characterized by "persistent paranoia and guardedness” but nevertheless concluded that the defendant did not require in-patient treatment. Not one of the experts on either side expressed any belief that defendant is currently a danger to himself or anyone else or that his condition is not amenable to out-patient treatment. As the Court of Appeals held in a murder case: "An individual’s *173 liberty cannot be deprived by 'warehousing’ him in a mental institution when he is not suffering from a mental illness or defect and in no need of in-patient care and treatment on a ground which amounts to a presumption of a dangerous propensity flowing from, as in this case, an isolated, albeit tragic, incident occurring years ago. Were this the standard for involuntary institutionalization, logical extension would require that anyone convicted of a violent crime should upon completion of his sentence similarly be required to demonstrate that he or she is not dangerous before his release into the community.” (Matter of Torsney, 47 NY2d 667, 682-683 [1979].)
The court certainly takes note of the seriousness of defendant’s illness and the possibility of relapse as indicated by its "waxing and waning course”. Dr. Gould’s optimism is not shared by the court. Given the defendant’s fluctuating mental state, no one can predict his reaction to unanticipated personal or professional difficulties or setbacks. The court has concluded that the defendant’s illness, although not chronic, should not lightly be characterized as "episodic” as Dr. Gould testified. However, all of the experts have expressed the belief that defendant can be effectively monitored on a regular basis through out-patient treatment. Although defendant Goodman’s mental status cannot be definitively categorized by experts, it can be and has been described to this court. What is clear is that, despite his request, defendant Goodman should not be unconditionally discharged.
In lieu of defendant’s commitment to the Commissioner of Mental Hygiene, the People request that he be discharged subject to an order of conditions as provided in CPL 330.20 (7): "If, at the conclusion of the initial hearing, the court finds that the defendant does not have a dangerous mental disorder and is not mentally ill [as defined by section 330.20 (1) (c) (d)], the court must discharge the defendant either unconditionally or subject to an order of conditions” (emphasis supplied).
This court agrees with and hereby grants the People’s request for defendant’s discharge subject to the following order of conditions:
1. For a period of one year from the date of this order, Richard Goodman is directed to report for monthly evaluations by Dr. Ewald Horwath or another OMH-designated clinic/clinician. Thereafter, visits may be quarterly upon approval of the court.
*174 2. Richard Goodman is also directed to receive out-patient psychiatric services from his current treating physician, Dr. Robert Gould, at least twice per month or more frequently as prescribed. Mr. Goodman is directed to comply with all treatment modalities prescribed by his current physician. He is also directed to authorize his treating physician to provide quarterly reports to the Associate Commissioner for Forensic Service for the New York State Office of Mental Health and the Special Projects Bureau for the New York County District Attorney’s office describing Mr. Goodman’s compliance with prescribed treatment and the order of conditions as well as his current psychiatric condition.
3. Should Richard Goodman cease being treated by Dr. Gould, he is directed to continue to receive out-patient psychiatric services from an OMH-designated clinic or clinician or from a private practitioner approved by the Associate Commissioner for the New York State Office of Mental Health’s Bureau of Forensic Services.
4. Throughout the period covered by the order of conditions, the OMH evaluations and the aforesaid quarterly reports are directed to be submitted to the court. In addition, to coincide with the receipt of the aforesaid reports, Richard Goodman is directed to appear before this court on a quarterly basis.
5. Richard Goodman is directed to keep the Associate Commissioner for Forensic Services and the Special Projects Bureau for the New York County District Attorney’s office apprised of his current address and telephone number as well as the address and telephone number of his place of business. He is directed to provide the Special Projects Bureau and the Associate Commissioner with 10 days’ advance written notice of any change in residence.
6. In the event of a relapse in Mr. Goodman’s psychiatric condition or any behavior or change in his condition which would indicate that Mr. Goodman is a danger to himself or others or currently suffers from a "Dangerous mental disorder” as defined in CPL 330.20 (c), the court hereby directs the above-mentioned doctors or any authorized mental health professional acting on their behalf to immediately inform the court and the District Attorney’s Special Projects Bureau of Mr. Goodman’s condition so that proceedings pursuant to CPL 330.20 (14) can be commenced. This paragraph is not intended to be a substitute for nor an abrogation of any other emergency powers or obligations the aforesaid medical and mental *175 health professionals may have under law or ethical standards to protect a mentally ill individual or the public.
7. Said order of conditions will be valid for a period of five years from November 15, 1994, unless this court shall sooner terminate said order of conditions. Prior to the expiration date of said order of conditions, the Commissioner may apply to this court, upon good cause, for an order extending said order of conditions for an additional five years.
8. Any private clinic or clinician acting hereunder is to be served with a copy of this order and must agree to abide by the conditions set forth herein before undertaking treatment of Mr. Goodman.

 The court notes that the Mental Hygiene Law contains a somewhat different definition of "mental illness”: Mental Hygiene Law § 1.03 (20). " 'Mental illness’ means an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.”
While the CPL’s four-step statutory scheme — dangerous mental disorder, mentally ill, discharge with conditions, and unconditional discharge — may be internally consistent, the definition of "mentally ill” in the CPL differs significantly from the definition in the Mental Hygiene Law and may lead to confusion and abuse. The Legislature might clarify matters by changing the term "mentally ill” in paragraph (d) of CPL 330.20 (1) to "impaired mental disorder” or some term other than "mentally ill”, so that the Mental Hygiene Law definition of "mentally ill” would be universally accepted and applied.